Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/16/2018 09:12 AM CST

ROBIN J. WISNER, AS PERSONAL REPRESENTATIVE OF
THE ESTATE OF GLADYS P. WISNER, DECEASED,
APPELLANT, V. VANDELAY INVESTMENTS,
L.L.C., A NEBRASKA LIMITED LIABILITY
COMPANY, ET AL., APPELLEES.

___ N.W.2d ___

Filed August 24, 2018.    No. S-16-451.

1. **Standing: Jurisdiction: Parties.** Standing is a jurisdictional component of a party's case because only a party who has standing may invoke the jurisdiction of a court.
2. **Jurisdiction: Appeal and Error.** The question of jurisdiction is a question of law, upon which an appellate court reaches a conclusion independent of the trial court.
3. **Equity: Quiet Title.** A quiet title action sounds in equity.
4. **Equity: Appeal and Error.** On appeal from an equity action, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the conclusion reached by the trial court, provided that where credible evidence is in conflict in a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.
5. **Statutes: Appeal and Error.** Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.
6. **Standing: Words and Phrases.** Standing is the legal or equitable right, title, or interest in the subject matter of the controversy.
7. **Jurisdiction: Standing.** The requirement of standing is fundamental to a court's exercise of jurisdiction, and either a litigant or a court before which a case is pending can raise the question of standing at any time during the proceeding.

8. **Title: Deeds: Tax Sale: Standing.** Neb. Rev. Stat. § 77-1844 (Reissue 2009) sets forth the conditions precedent to questioning title conveyed under a tax deed; to obtain standing to redeem property after the issuance of a tax deed, even if title under a tax deed is void or voidable, a party must satisfy these conditions precedent.

9. **Title: Deeds: Tax Sale: Public Officers and Employees.** To comply with Neb. Rev. Stat. § 77-1844 (Reissue 2009), a party only needs to show that it has tendered the tax payment to the treasurer, not that the taxes have actually been paid.

10. **Pleadings: Evidence: Words and Phrases.** A judicial admission is a formal act done in the course of judicial proceedings which is a substitute for evidence, thereby waiving or dispensing with the production of evidence by conceding for the purpose of litigation that the proposition of fact alleged by the opponent is true.

11. **Jurisdiction.** While parties cannot confer subject matter jurisdiction upon a judicial tribunal by either acquiescence or consent, nor may subject matter jurisdiction be created by waiver, estoppel, consent, or conduct of the parties, such does not prevent a party from conclusively admitting the truth of an underlying fact required to establish subject matter jurisdiction by judicial admission.

12. **Pleadings: Evidence.** Judicial admissions must be unequivocal, deliberate, and clear, and not the product of mistake or inadvertence.

13. **Pleadings: Intent.** A judicial admission does not extend beyond the intendment of the admission as clearly disclosed by its context.

14. **Pleadings: Words and Phrases.** Generally, an admission made in a pleading on which the trial is had is more than an ordinary admission; it is a judicial admission.

15. **Pleadings: Proof.** It is an elementary rule of pleading that matters admitted by the pleadings need not be proved.

16. **Title: Deeds: Tax Sale: Taxes: Evidence.** A showing pursuant to Neb. Rev. Stat. § 77-1844 (Reissue 2009) of taxes paid must be made by the evidence and not by allegations in the pleadings alone.

17. **Real Estate: Taxes: Tax Sale: Words and Phrases.** Under Neb. Rev. Stat. § 77-1801 et seq. (Reissue 2009, Cum. Supp. 2016 & Supp. 2017), the term "redemption" refers to paying the amount shown on the certificate and all subsequent taxes, along with the interest accrued thereon and any statutory fees.

18. **Pleadings: Evidence: Waiver.** A party may waive its right to rely on an opponent's admission by failing to object to the opponent's offer of contrary evidence or introducing contrary evidence itself.

19. **Pleadings: Evidence: Parties.** A party is bound to its admission absent the court's relieving it, in exercise of the court's judicial discretion, from that consequence.

20. **Appeal and Error.** An argument not presented to or decided by the trial court is not appropriate for consideration on appeal.

21. **Statutes: Legislature: Intent.** Components of a series or collection of statutes pertaining to a certain subject matter are in pari materia and should be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions are consistent, harmonious, and sensible.

22. **Title: Deeds: Tax Sale: Standing: Public Officers and Employees: Case Disapproved.** To satisfy the tax payment requirement in Neb. Rev. Stat. § 77-1844 (Reissue 2009), a party must show the tender or payment of taxes due to the county treasurer; *Hauxwell v. Henning*, 291 Neb. 1, 863 N.W.2d 798 (2015), is disapproved to the extent it can be read to authorize satisfying the standing requirement in § 77-1844 by tender or payment to the tax deed holder.

23. **Title: Deeds: Tax Sale: Statutes.** The statutory prerequisites to defeating title, in Neb. Rev. Stat. § 77-1843 (Reissue 2009), apply only to those tax deeds made after substantial compliance with Neb. Rev. Stat. §§ 77-1831 to 77-1842 (Reissue 2009, Cum. Supp. 2016 & Supp. 2017).

24. **Title: Deeds: Tax Sale: Proof: Presumptions: Evidence.** A county treasurer's tax deed is presumptive evidence that the procedures required by law to make a good and valid tax sale and vest title in the purchaser were done. The presumption is not conclusive and may be rebutted, but the burden is upon the party attacking the validity of such a deed to show by competent evidence some jurisdictional defect voiding the deed.

25. **Tax Sale: Service of Process.** Under Neb. Rev. Stat. § 77-1832 (Reissue 2009), service need only be provided to the owner of record at the address where the property tax statement was mailed and may only be done by certified mail, return receipt requested.

26. **Statutes.** A court must attempt to give effect to all parts of a statute, and if it can be avoided, no word, clause, or sentence will be rejected as superfluous or meaningless.

27. **Tax Sale: Notice: Service of Process: Words and Phrases.** Under Neb. Rev. Stat. § 77-1834 (Cum. Supp. 2016), the phrase "diligent inquiry" requires the tax certificate holder to obtain the address where the property tax statement was mailed in order to send notice by certified mail before moving to service by publication.

28. **Statutes: Appeal and Error.** Generally, statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.

29. **Statutes.** A statute can be considered ambiguous when a particular interpretation from the face of the statute could lead to an anomalous, unusual, or absurd result.

30. ____. It is impermissible to follow a literal reading that engenders absurd consequences where there is an alternative interpretation that reasonably effects a statute's purpose.

31. **Statutes: Intent.** In the exposition of statutes, the reason and intention of the lawgiver will control the strict letter of the law when the latter would lead to palpable injustice or absurdity.

32. **Real Estate: Taxes: Tax Sale.** The overall objective of the certificate method for delinquent taxes is the recovery of unpaid taxes on real property.

33. **Statutes: Courts: Words and Phrases.** A term of art is a word or phrase having a specific, precise meaning in a given specialty apart from its general meaning in ordinary contexts. The Nebraska Supreme Court has ascribed the term of art meaning to statutory terms when necessitated by the statute's context.

34. **Tax Sale: Notice: Service of Process: Words and Phrases.** The word "found" in Neb. Rev. Stat. § 77-1834 (Cum. Supp. 2016) means "able to be served."

35. **Tax Sale: Notice: Service of Process: Proof.** Under Neb. Rev. Stat. § 77-1834 (Cum. Supp. 2016), a tax certificate holder may provide service by publication to an owner of record who was not able to be served by certified mail at the address where the property tax statement was mailed, upon proof of compliance with Neb. Rev. Stat. § 77-1832 (Reissue 2009) if the owner, in fact, lives at such address.

36. **Courts: Judgments: Appeal and Error.** Upon further review from a judgment of the Nebraska Court of Appeals, the Nebraska Supreme Court will not reverse a judgment which it deems to be correct simply because its reasoning differs from that employed by the Court of Appeals.

37. **Tax Sale: Notice: Proof.** Under Neb. Rev. Stat. § 77-1835 (Cum. Supp. 2016), a proof of publication needs to state only that notice was published in the manner provided in Neb. Rev. Stat. § 77-1834 (Cum. Supp. 2016).

38. **Affidavits.** In the absence of a sufficient showing to the contrary, the affidavit of the publisher that a newspaper was one of general circulation in the county must be held sufficient to establish the fact.

39. **Tax Sale: Notice: Words and Phrases.** Under Neb. Rev. Stat. § 77-1834 (Cum. Supp. 2016), the plain meaning of the word "in" shows that a newspaper only need be generally circulated within the county, not throughout the entire county.

40. **Courts: Appeal and Error.** Upon reversing a decision of the Nebraska Court of Appeals, the Nebraska Supreme Court may consider, as it deems appropriate, some or all of the assignments of error the Court of Appeals did not reach.

41. **Deeds: Tax Sale.** In order to defeat a tax deed, a party must show that it satisfied the conditions precedent in Neb. Rev. Stat. § 77-1843 (Reissue 2009).

42. **Tax Sale: Mental Health: Time.** Neb. Rev. Stat. § 77-1827 (Reissue 2009) extends the redemption period for a mental disorder only if the owner had a mental disorder at the time of the property's sale.

43. **Statutes: Presumptions: Legislature: Intent.** In interpreting a statute, a court is guided by the presumption that the Legislature intended a sensible rather than absurd result in enacting the statute.

44. **Tax Sale: Mental Health: Words and Phrases.** A person with a "mental disorder" under Neb. Rev. Stat. § 77-1827 (Cum. Supp. 2016) is one who suffers from a condition of mental derangement which actually prevents the sufferer from understanding his or her legal rights or from instituting legal action, and a mental disorder within the meaning of § 77-1827 is an incapacity which disqualifies one from acting for the protection of one's rights.

45. **Equity.** Equity strives to do justice; it is not a rigid concept, but, instead, is determined on a case-by-case basis according to concepts of justice and fairness.

Petition for further review from the Court of Appeals, Moore, Chief Judge, and Inbody and Riedmann, Judges, on appeal thereto from the District Court for Lincoln County, Richard A. Birch, Judge. Judgment of Court of Appeals reversed, and cause remanded with directions.

David W. Pederson, of Pederson & Troshynski, for appellant.

Robert S. Lannin and Chris S. Schmidt, of Baylor, Evnen, Curtiss, Grimit & Witt, L.L.P., for appellee Vandelay Investments, L.L.C.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, and Funke, JJ.

Funke, J.

Robin J. Wisner, personal representative of the estate of Gladys P. Wisner, deceased, appealed from a district court judgment that quieted title to certain property in favor of Vandelay Investments, L.L.C. (Vandelay), and dismissed his complaint—which requested that the court set aside Vandelay's tax deed and permit him to exercise a right of redemption. The Nebraska Court of Appeals reversed the district court's decision and remanded the cause after finding Vandelay had failed to comply with the statutory notice requirements before applying for the tax deed, which failure rendered Vandelay's deed void.

On further review, we conclude that (1) Robin had standing to question Vandelay's tax deed, (2) Vandelay complied with the statutory notice requirements before applying for the tax deed, and (3) Robin failed to prove that the extension to the statutory redemption period for an owner with a mental disorder applied. Therefore, we reverse the decision of the Court of Appeals and remand the cause with directions that the Court of Appeals affirm the judgment of the district court.

## I. BACKGROUND

### 1. Statutory Framework

This case involves the purchase of real property due to delinquent real estate taxes.[1] The purchaser of any real property sold by the county treasurer for taxes is entitled to a certificate in writing, commonly known as a tax certificate or tax sale certificate.[2] This certificate represents a transfer of the state's lien on the property to the purchaser and describes the property, the amount paid by the purchaser, and the date that the purchaser will be entitled to a deed.[3] Tax certificates can

---

[1] See Neb. Rev. Stat. § 77-1801 et seq. (Reissue 2009, Cum. Supp. 2016 & Supp. 2017) and § 77-1901 et seq. (Reissue 2009 & Cum. Supp. 2016).

[2] § 77-1818.

[3] *Coffin v. Old Line Life Ins. Co.*, 138 Neb. 857, 295 N.W. 884 (1941); § 77-1818; Neb. Rev. Stat. § 77-203 (Reissue 2009).

be assigned by endorsement, and the assignee steps into the shoes of the purchaser.[4]

A property owner may redeem his or her property by paying the county treasurer the amount shown on the certificate and all subsequent taxes, along with the interest accrued thereon and any statutory costs.[5] If the property is not redeemed within 3 years, however, the tax certificate holder may pursue either one of two options: (1) apply for a deed of conveyance for the property, commonly known as a tax deed, with the county treasurer[6] or (2) proceed in district court to foreclosure on its lien and compel the sale of the property.[7] Tax sale certificates and the sale of tax certificates are governed by chapter 77, article 18, of the Nebraska Revised Statutes, and the foreclosure of tax certificates is governed by chapter 77, article 19, of the Nebraska Revised Statutes for all tax sale certificates sold and issued between January 1, 2010, and December 31, 2017.[8]

Vandelay elected to pursue the tax deed method. Under this method, the holder of the tax certificate has a 6-month period, commencing 3 years from the date of the sale of the property, to apply for a tax deed from the county treasurer.[9] Upon a county treasurer's delivery of the tax deed to the tax certificate holder, a property owner loses the ability to redeem the property through the county treasurer.[10] If the certificate holder waits longer than 3 years 6 months from the sale to apply for a tax deed, the certificate ceases to be valid and the lien of taxes for which the property was sold is discharged.[11]

---

[4] § 77-1822.

[5] §§ 77-1824 and 77-1830.

[6] § 77-1837. See, generally, § 77-1801 et seq.

[7] § 77-1902. See, generally, § 77-1901 et seq.

[8] § 77-1837.01.

[9] § 77-1837.

[10] § 77-1824.

[11] § 77-1856.

However, at least 3 months before applying for the tax deed, the holder of the tax certificate must serve the record owner and encumbrancers of record with sufficient notice that application for a tax deed will be made.[12]

After a tax deed has been issued, the owner of the property may recover the property by proving the tax deed issued to the tax certificate holder is either void or voidable. A tax deed is void if the tax certificate holder did not substantially comply with the notice requirements.[13] A tax deed is voidable if the property owner has a right to redeem the property and has exercised such right.[14] While a property owner's ability to redeem property typically ends upon the delivery of a tax deed, an owner with a mental disorder at the time of the property's sale may redeem the property within 5 years from the date of the sale.[15]

Here, Robin claims that Vandelay did not sufficiently comply with the notice requirements to obtain the tax deed. He further contends that he has a right to redemption under this extended redemption period due to the mental disorder of Gladys, the record owner of the property.

## 2. Issuance of Tax Deed to Vandelay

The real estate involved in this action consists of 480 acres, containing irrigated cropland, rangeland, and a homestead; is located about 9 miles southeast of North Platte, Nebraska; and has the following legal description: "The North Half (N½) and the North Half of the South Half (N½S½) of Section Twenty-Nine (29), Township Thirteen (13) North, Range Twenty-Nine (29) West of the 6th P.M., in Lincoln County, Nebraska."

Gladys and her husband moved onto the property in 1949 and inherited it upon the passing of Gladys' father in 1971.

---

[12] § 77-1831 (Cum. Supp. 2012).

[13] *Ottaco Acceptance, Inc. v. Larkin*, 273 Neb. 765, 733 N.W.2d 539 (2007). See §§ 77-1842 and 77-1843.

[14] § 77-1843.

[15] § 77-1827.

They had two sons, Robin and Roger Wisner, and two daughters. After Gladys' husband died in 2007, Roger primarily cared for Gladys and handled her affairs until his own death in 2009. Robin then assisted Gladys in moving from the homestead to a retirement community and arranged for her bills to be paid from her trust by a bank's trust department.

Robin testified he assumed the trust department was paying the real estate taxes, because he thought Roger had probably paid them from the trust previously. While Robin stated that he had access to semiannual records from the trust, he testified that he did not typically check them closely or at all and that he never saw that the real estate taxes were being paid from it.

In 2010, the real estate taxes on the property became delinquent. In March 2011, the Lincoln County treasurer sold a tax sale certificate on the property to Acron Business Services, Inc. In February 2014, Vandelay purchased the tax sale certificate from Acron Business Services. Randy James, one of Vandelay's owners, obtained the address where Gladys received her property tax statements, which was that of the retirement community. In March 2014, Vandelay sent notice of its intent to apply for a tax deed to Gladys at that address by certified mail with a return receipt requested, which was returned as "unclaimed."

Despite the return of the certified mailing, James believed he had Gladys' actual address because it was not returned as sent to a vacant address or not deliverable as addressed. In addition, James had found a newspaper article, dated June 11, 2011, indicating that Gladys, in fact, lived at the retirement community.

Vandelay then published notice of its intent to apply for a tax deed in the Sutherland Courier-Times newspaper (Courier-Times) for 3 consecutive weeks. Evidence was presented that the Courier-Times covers events affecting Lincoln County, Nebraska, and residents in Sutherland, Hershey, and Paxton, Nebraska, and that approximately 1,300 weekly editions are sent to subscribers and distributed to racks in those three

communities. In ZIP codes covering North Platte, there are about 100 Courier-Times subscribers but no distribution racks. Vandelay also sent a copy of the publicized notice to Gladys' address by first-class mail, which was not returned.

In August 2014, Vandelay applied for a tax deed. Included with its application were a copy of the certified mail return receipt, a proof of publication in the Courier-Times, and an affidavit from James attesting that he had complied with the service requirements. The proof of publication attested that the Courier-Times is a legal newspaper in general circulation that is published in Sutherland and that the attached notice was published for 3 consecutive weeks, dates specified. The county treasurer delivered a tax deed to the property to Vandelay in September 2014.

Through the relevant period, the property was under lease, but the lease was not recorded. Shortly after the tax deed was filed, however, the lessee informed Robin that a deed had been issued in Vandelay's favor. Robin, as the holder of a power of attorney for Gladys, attempted to redeem the tax sale certificate with Vandelay, which Vandelay rejected.

### 3. DISTRICT COURT PROCEEDINGS

Gladys, by and through Robin, filed a complaint against Vandelay, requesting to have Vandelay's tax deed voided, have her deed redeemed pursuant to the mental disorder extension, and title quieted in her name. Vandelay filed a counterclaim seeking to quiet title in its favor. Robin was substituted as the party plaintiff after Gladys' death.

The court ruled Vandelay had complied with the statutory requirements for notice and publication. It reasoned that "[i]f Gladys could not be served after compliance by [Vandelay] with [§] 77-1832, she was therefore not found for service within the meaning of [§] 77-1834." The court also found the publication in the Courier-Times complied with the statutory requirement. Further, the court ruled Robin failed to prove Gladys had a mental disorder, and it rejected Robin's

equity argument. Thus, the court dismissed Robin's complaint with prejudice and quieted title in favor of Vandelay.

Robin filed a timely appeal.

### 4. Court of Appeals Proceedings

Before the Court of Appeals, Robin assigned, restated, that the district court erred in (1) finding Vandelay complied with the statutory notice and publication requirements for obtaining a treasurer's tax deed, (2) finding Robin failed to prove Gladys suffered from a mental disorder, and (3) failing to use its equitable authority to remedy the situation.

The Court of Appeals reversed the district court's decision and remanded the cause for further proceedings after holding that Gladys was entitled to redeem the property because Vandelay had not served Gladys with notice.[16] It reasoned that Vandelay's notice by certified mail was insufficient because it was returned as "'unclaimed.'"[17] Further, the Court of Appeals stated that notice by publication could not be relied on because Vandelay knew Gladys' address, so she had been "found."[18] The Court of Appeals did not reach Robin's second and third assignments of error.

Vandelay filed a timely petition for further review, which this court granted.

### II. ASSIGNMENTS OF ERROR

Vandelay assigns, reordered and restated, that the Court of Appeals erred in (1) not determining Robin lacks standing to challenge the tax deed, under § 77-1844; (2) interpreting § 77-1834 not to permit service by publication in this case; (3) not interpreting the term "found" as the equivalent of being "served"; (4) voiding Vandelay's tax deed and determining Gladys was entitled to redeem the property; and (5) failing to

---

[16] See *Wisner v. Vandelay Investments*, No. A-16-451, 2017 WL 2399492 (Neb. App. May 30, 2017) (selected for posting to court website).

[17] *Id*. at *4.

[18] *Id.*

acknowledge Vandelay's sending of a copy of the publication notice by first-class mail to Gladys' address of record, which copy was not returned, as accomplishing service.

## III. STANDARD OF REVIEW

[1,2] Standing is a jurisdictional component of a party's case because only a party who has standing may invoke the jurisdiction of a court.[19] The question of jurisdiction is a question of law, upon which an appellate court reaches a conclusion independent of the trial court.[20]

[3,4] A quiet title action sounds in equity.[21] On appeal from an equity action, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the conclusion reached by the trial court, provided that where credible evidence is in conflict in a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.[22]

[5] Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.[23]

## IV. ANALYSIS

### 1. Robin Has Standing to Challenge Vandelay's Tax Deed

Vandelay contends Robin lacks standing to challenge its tax deed. It argues Robin did not satisfy a condition precedent

---

[19] *Applied Underwriters v. S.E.B. Servs. of New York*, 297 Neb. 246, 898 N.W.2d 366 (2017).

[20] *J.S. v. Grand Island Public Schools*, 297 Neb. 347, 899 N.W.2d 893 (2017).

[21] *Royal v. McKee*, 298 Neb. 560, 905 N.W.2d 51 (2017).

[22] *Id.*

[23] *J.S., supra* note 20.

to questioning the validity of its tax deed, under § 77-1844, because he failed to offer any evidence that he either paid or tendered payment of the taxes due on the property to the county treasurer. Vandelay further argues that its response to Robin's allegation in his pleading—that he tendered payment to the county treasurer—cannot be considered a judicial admission regarding tender to the county treasurer because its statement was not unequivocal, clear, or deliberate.

Robin argues Vandelay's answer was a judicial admission, which acted as a substitute for such evidence by conclusively admitting the fact's truth in this case. He also argues tendering payment to Vandelay satisfied condition precedent of § 77-1844, citing *Hauxwell v. Henning*.[24]

### (a) Statutory Requirements to Obtain Standing to Challenge Tax Deed

[6,7] Standing is the legal or equitable right, title, or interest in the subject matter of the controversy.[25] The requirement of standing is fundamental to a court's exercise of jurisdiction, and either a litigant or a court before which a case is pending can raise the question of standing at any time during the proceeding.[26] A party invoking a court's or tribunal's jurisdiction bears the burden of establishing the elements of standing.[27]

[8,9] To obtain standing to redeem property after the issuance of a tax deed, even if title under a tax deed is void or voidable, a party must satisfy the requirements of § 77-1844.[28] Section 77-1844 sets forth the conditions precedent to questioning title conveyed under a tax deed.[29] Under § 77-1844,

---

[24] *Hauxwell v. Henning*, 291 Neb. 1, 863 N.W.2d 798 (2015).

[25] *Landrum v. City of Omaha Planning Bd.*, 297 Neb. 165, 899 N.W.2d 598 (2017).

[26] *Id.*

[27] *Applied Underwriters, supra* note 19.

[28] See, *Hauxwell, supra* note 24; *Ottaco Acceptance, Inc., supra* note 13.

[29] *Ottaco Acceptance, Inc., supra* note 13.

a party must prove the person under whom he or she claims title (1) had title to the property at the time of the tax sale and (2) paid all taxes due upon the property. To comply with § 77-1844, a party only needs to show that it has tendered the tax payment to the treasurer, not that the taxes have actually been paid.[30] Payment or tender thereof may be made before or during the trial, or before final judgment.[31]

### (b) Vandelay's Answer Constituted Judicial Admission That Robin Tendered Payment of Taxes Due to County Treasurer

[10,11] A judicial admission is a formal act done in the course of judicial proceedings which is a substitute for evidence, thereby waiving or dispensing with the production of evidence by conceding for the purpose of litigation that the proposition of fact alleged by the opponent is true.[32] While parties cannot confer subject matter jurisdiction upon a judicial tribunal by either acquiescence or consent, nor may subject matter jurisdiction be created by waiver, estoppel, consent, or conduct of the parties,[33] such does not prevent a party from conclusively admitting the truth of an underlying fact required to establish subject matter jurisdiction by judicial admission.

This distinction is illustrated by *J.S. v. Grand Island Public Schools*,[34] where we held the district court lacked subject matter jurisdiction because the appellant did not serve the appellee with a copy of the petition after the appellee waived such service. Here, contrariwise, the allegation is that Vandelay admitted the taxes had actually been tendered to the county treasurer, a condition precedent for standing.

---

[30] *Hauxwell, supra* note 24.

[31] *Ottaco Acceptance, Inc., supra* note 13.

[32] *Id.*

[33] *J.S., supra* note 20.

[34] *Id.*

[12,13] Judicial admissions must be unequivocal, deliberate, and clear, and not the product of mistake or inadvertence.[35] A judicial admission does not extend beyond the intendment of the admission as clearly disclosed by its context.[36]

### (i) Admission in Pleading May Serve as Sufficient Evidence to Satisfy Standing Requirement in § 77-1844

[14,15] We begin by addressing Vandelay's argument that an admission in its answer could not satisfy the standing requirement. Generally, an admission made in a pleading on which the trial is had is more than an ordinary admission; it is a judicial admission.[37] It is an elementary rule of pleading that matters admitted by the pleadings need not be proved.[38] Despite these propositions, Vandelay points to *Hauxwell*, where we stated that for the purposes of § 77-1844, "[t]he showing of taxes paid must be made by the evidence and not by the pleadings alone."[39]

Our proposition in *Hauxwell* originated in the modification of our opinion on rehearing of *Cornell v. Maverick Loan & Trust Co.*,[40] which affirmed our opinion with an explanation that we had not referenced the predecessor statute to § 77-1844 because the taxes were clearly not shown to have been paid. While we stated in our opinion on rehearing that the pleadings alone were insufficient to provide such proof, our discussion of the facts in our initial decision reveals that the plaintiff had alleged tender of payment in its complaint but does not state the fact was admitted by the defendant.

---

[35] *In re Estate of Radford*, 297 Neb. 748, 901 N.W.2d 261 (2017).

[36] *Lewison v. Renner*, 298 Neb. 654, 905 N.W.2d 540 (2018).

[37] *Id.*

[38] *Id.*

[39] *Hauxwell, supra* note 24, 291 Neb. at 6, 863 N.W.2d at 802.

[40] *Cornell v. Maverick Loan & Trust Co.*, 95 Neb. 9, 144 N.W. 1074 (1914), *modified on denial of rehearing* 95 Neb. 842, 147 N.W. 697.

Thus, we do not find a conflict between our statement in *Cornell* and our propositions of law concerning admissions in pleadings.

[16] Nevertheless, as a matter of clarity, we amend our proposition from *Cornell* as follows: The showing pursuant to § 77-1844 of taxes paid must be made by the evidence and not by *allegations in* the pleadings alone.

### (ii) Vandelay Admitted Robin Tendered Redemption to County Treasurer

Regarding Robin's efforts to pay the taxes due on the property, paragraph 16 of the complaint alleges, "[Robin] presented the redemption to [Vandelay] and to the Lincoln County Treasurer within forty-five (45) days of [Vandelay's] Application for Tax Deed, but the County Treasurer declined to accept the redemption for filing"; Vandelay's answer "[a]dmits that Lincoln County Treasurer declined to accept [Robin's] redemption, but denies the remaining allegations of paragraph 16."

Vandelay asserts that Robin's allegation should be read as two separate allegations: (1) Robin presented redemption to Vandelay and the county treasurer and (2) the county treasurer declined to accept Robin's redemption. It argues its answer admitted only the second allegation and denied the first allegation. It argues that reading its answer to admit that Robin tendered payment to the county treasurer would give no effect to its denial.

We disagree with Vandelay's interpretation. Vandelay's admission that the county treasurer declined to accept Robin's redemption necessarily admits Robin tendered redemption to the county treasurer; redemption cannot be denied if it was never offered. Despite Vandelay's contention, this interpretation gives effect to its general denial because the allegation that Robin tendered payment to Vandelay is completely separate from the allegation concerning the county treasurer.

[17] Further, we find that this admission is clear regarding the tender of all of the taxes due on the property. As stated

above, redemption under § 77-1801 et seq. refers to paying the amount shown on the certificate and all subsequent taxes, along with the interest accrued thereon and any statutory fees.[41] Thus, Vandelay's response conclusively admitted Robin tendered payment of all taxes due on the property to the county treasurer and acted as a substitute for evidence of such, dispensing with Robin's need to produce such evidence for the purpose of this case.

[18] Vandelay's additional arguments that its admission was an inadvertency and that Robin waived its judicial admission are unavailing. In *Robison v. Madsen*,[42] we recognized that a party may waive its right to rely on an opponent's admission by failing to object to the opponent's offer of contrary evidence or introducing contrary evidence itself.[43] Robin's testimony that he tendered payment to Vandelay and that the taxes were unpaid at the time of trial was not contrary to the judicial admission concerning Robin's tender of payment to the county treasurer. Accordingly, Robin did not offer contrary evidence waiving Vandelay's admission.

[19,20] Further, a party is bound to its admission absent the court's relieving it, in exercise of the court's judicial discretion, from that consequence.[44] The requirements of § 77-1844 are clearly stated in the statute and well established in our case law. If Vandelay had not intended to admit that Robin tendered payment to the county treasurer, it should have raised the issue in the district court, where it could have requested to be relieved of the consequence of its admission. An argument not presented to or decided by the trial court is not appropriate for consideration on appeal.[45] Therefore, Vandelay cannot argue

---

[41] §§ 77-1824 and 77-1830.

[42] *Robison v. Madsen*, 246 Neb. 22, 516 N.W.2d 594 (1994).

[43] *Id.* (citing *Collision Center Paint & Body v. Campbell*, 773 S.W.2d 354 (Tex. App. 1989); *Jenni v. Gamel*, 602 S.W.2d 696 (Mo. App. 1980); and 31A C.J.S. *Evidence* § 381 c. (1964)).

[44] See *Kipf v. Bitner*, 150 Neb. 155, 33 N.W.2d 518 (1948).

[45] *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018).

for the first time on appeal that it should not be bound by the plain meaning of its admission.

The evidence presented at trial also clearly established that Gladys had title to the property at the time of its sale. Therefore, Robin proved that he had standing to question Vandelay's tax deed, under § 77-1844.

### (c) Tender of Payment to Tax Deed Holder Is Not Sufficient to Obtain Standing

Robin also argued that we held in *Hauxwell* that payment or tender of payment to a deed holder is sufficient to obtain standing, under § 77-1844.[46] We address this argument to clarify our holding in *Hauxwell*.

In *Hauxwell*, Selma B. Hauxwell filed a complaint seeking to quiet title by claim of adverse possession in certain properties after Ryan R. Hanzlick and his wife acquired tax deeds to the same.[47] We held that the district court erred by not dismissing the complaint for lack of jurisdiction due to Hauxwell's failure to establish standing, under § 77-1844.[48] Robin cites our conclusion that "Hauxwell did not plead or demonstrate through evidence that payment of the past due taxes was ever made or tendered to the treasurer or to the Hanzlicks."[49]

Directly preceding this conclusion, however, we cited our longstanding proposition of law that to satisfy the tax payment requirement of § 77-1844, "the party needs only to show the tender of payment of taxes *to the treasurer*."[50] In concluding that there was also no payment or tender to the Hanzlicks, we provided no support or explanation for the implication that doing so would satisfy the standing requirements of § 77-1844 and expanding our precedent.

---

[46] *Hauxwell, supra* note 24.

[47] *Id.*

[48] *Id.*

[49] See *id.* at 7, 863 N.W.2d at 802.

[50] *Id.* at 6, 863 N.W.2d at 802 (emphasis supplied).

When we adopted this longstanding proposition, it was based on our reasoning that when a plaintiff has tendered payment to the county treasurer and such payment is refused, a "plaintiff could not do more" under the tax certificate statutes to satisfy the standing requirement.[51] This reasoning itself necessarily rejects an argument that making payment to the tax deed holder would be an acceptable alternative.

[21] Our statement in *Hauxwell* was also not supported by our tax certificate statutes.[52] Components of a series or collection of statutes pertaining to a certain subject matter are in pari materia and should be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions are consistent, harmonious, and sensible.[53] Sections 77-1844 and 77-1843 both provide statutory prerequisites for property owners to recover their property after the issuance of a tax deed.

While § 77-1844 does not specify whom the taxes due on the property must be paid to, § 77-1843 requires the property to have been redeemed pursuant to various statutory sections. Section 77-1843 explicitly references Neb. Rev. Stat. § 77-1701(1) (Reissue 2009), which provides in part: "The county treasurer shall be ex officio county collector of all taxes levied within the county." As we mentioned above, redemption, a term of art in § 77-1801 et seq., includes the payment of all property taxes due.

[22] Thus, we hold that to satisfy the tax payment requirement in § 77-1844, a party must show the tender or payment of taxes due to the county treasurer, and we disapprove of *Hauxwell* to the extent it can be read to authorize satisfying the standing requirement in § 77-1844 by tender or payment to the tax deed holder.[54]

---

[51] *Howell v. Jordan*, 94 Neb. 264, 266, 143 N.W. 217, 218 (1913).

[52] *Hauxwell, supra* note 24.

[53] *In re Trust of Shire*, 299 Neb. 25, 907 N.W.2d 263 (2018).

[54] *Hauxwell, supra* note 24.

## 2. Vandelay Substantially Complied
### With Statutory Notice Requirements
#### Before Applying for Tax Deed

Robin argues Vandelay's tax deed is void because he presented sufficient evidence to overcome the statutory presumption that the notice requirements were complied with before Vandelay applied for the tax deed. Specifically, he argues that Vandelay was not entitled to provide notice by publication and that Vandelay did not comply with the statutory publication requirements.

[23] Section 77-1843 provides the statutory prerequisites to defeating title "[i]n all controversies and suits involving the title to real property claimed and held under and by virtue of a deed made substantially by the treasurer in the manner provided by sections 77-1831 to 77-1842 . . . ."[55] We have interpreted § 77-1843 to apply only to those tax deeds made after substantial compliance with the aforementioned sections.[56] Accordingly, we consider the validity of Vandelay's tax deed.

[24] A county treasurer's tax deed is presumptive evidence that the procedures required by law to make a good and valid tax sale and vest title in the purchaser were done.[57] A tax deed holder is entitled to receive a tax deed from the county treasurer only after it "serves or causes to be served a notice," containing specific information provided therein, at least 3 months before applying for the tax deed.[58] Specifically, § 77-1842 provides that a tax deed is presumptive evidence that "the notice had been served or due publication made as required in sections 77-1831 to 77-1835 before the time of redemption had expired." The presumption is not conclusive and may be

---

[55] See *Ottaco Acceptance, Inc., supra* note 13.

[56] *Id.*

[57] *SID No. 424 v. Tristar Mgmt.*, 288 Neb. 425, 850 N.W.2d 745 (2014). See § 77-1842.

[58] § 77-1831.

rebutted, but the burden is upon the party attacking the validity of such a deed to show by competent evidence some jurisdictional defect voiding the deed.[59]

As to proper notice under the tax deed method, § 77-1832, in relevant part, provides: "Service of the notice provided by section 77-1831 shall be made by certified mail, return receipt requested, upon the person in whose name the title to the real property appears of record to the address where the property tax statement was mailed . . . ."

This section, however, has been the subject of significant revision since the turn of the century. The 2009 version resulted from a 2003 amendment to the following language: "Service of the notice provided by section 77-1831 shall be made on every person in actual possession or occupancy of the real property [and] upon the person in whose name the title to the real property appears of record . . . ."[60]

Further, the language of § 77-1832 (Supp. 2017), currently in effect, provides:

(1) Service of the notice provided by section 77-1831 shall be made by:

(a) Personal, residence, certified mail, or designated delivery service as described in section 25-505.01 upon every person in actual possession or occupancy of the real property who qualifies as an owner-occupant under section 77-1824.01; or

(b) Certified mail service as described in section 25-505.01 upon:

(i) The person in whose name the title to the real property appears of record who does not qualify as an owner-occupant under section 77-1824.01. The notice shall be sent to the name and address to which the property tax statement was mailed[.]

---

[59] *Ottaco Acceptance, Inc. v. Huntzinger*, 268 Neb. 258, 682 N.W.2d 232 (2004). See § 77-1842.

[60] § 77-1832 (Reissue 1996). See 2003 Neb. Laws, L.B. 319.

[25] In summary, direct service under the recent versions of § 77-1832 was provided for as follows: Before 2003, service was required both (1) on every person in actual possession or occupancy of the real property and (2) upon the person in whose name the title to the real property appears of record, and service was not limited to certified mail; under § 77-1832 (Reissue 2009), service need only be provided to the owner of record at the address where the property tax statement was mailed and may only be done by certified mail, return receipt requested; for tax certificates issued in 2018, service must be (1) made upon every owner-occupant by the methods authorized in Neb. Rev. Stat. § 25-505.01 (Reissue 2016) and (2) provided to the owner of record, if not an owner-occupant, at the address where the property tax statement was mailed by certified mail.

Besides § 77-1832, the only other section that provides for effectuating the service required by § 77-1831 is § 77-1834. Section 77-1834, in relevant part, has consistently provided:

> If the person in whose name the title to the real property appears of record in the office of the register of deeds in the county . . . cannot, upon diligent inquiry, be found, then such purchaser or his or her assignee shall publish the notice in some newspaper published in the county and having a general circulation in the county . . . .

There is no dispute that Vandelay sent notice to Gladys by certified mail, return receipt requested, and that it was returned as "'unclaimed'" after three attempted deliveries.[61] Because Vandelay was unable to serve Gladys in compliance with § 77-1832, it could comply with § 77-1831 only by causing Gladys to be served under § 77-1834. Accordingly, we consider Robin's arguments that Vandelay was not entitled to provide service under § 77-1834 and that the service it did provide was deficient.

---

[61] *Wisner v. Vandelay Investments, supra* note 16, 2017 WL 2399492 at *4.

(a) Vandelay Was Entitled to Serve Gladys
by Publication After It Was Unable to
Serve Her Notice by Certified Mail

Robin argues we should interpret "found" consistently with its plain meaning of a person's whereabouts' being actually known, as the Court of Appeals held. Under this interpretation, he argues that Vandelay could not serve Gladys by publication because it actually knew her address and that instead, its only course of action was to resend notice by certified mail or initiate foreclosure proceedings. Robin also contends publication was not available because Vandelay did not conduct a "diligent inquiry" by publishing notice after sending only one certified mailing and taking no other actions to provide Gladys notice.[62]

Vandelay contends that because § 77-1801 et seq. allows service only by certified mail and publication, we should construe the statutes harmoniously by interpreting someone to be "'found'" only when he or she has been "[actually] 'served'" by certified mail, not when his or her address of record simply becomes "'known.'" It also argues that its efforts were diligent because it sent the notice of publication to Gladys by first-class mail, which was not returned.

(i) "Diligent Inquiry" Under § 77-1834
Requires Party to Request Address Where
Property Tax Statements Are Sent
From County Treasurer

We begin by considering the meaning of "diligent inquiry," under § 77-1834. This phrase is not defined in the statutes, and we have not previously interpreted its meaning. Robin argues we should interpret the phrase consistently with "reasonable diligence," from Neb. Rev. Stat. § 25-517.02 (Reissue 2016).

Section 25-517.02 provides: "Upon motion and showing by affidavit that service cannot be made with reasonable diligence by any other method provided by statute, the court may

---

[62] Brief for appellant on petition for further review at 20.

permit service to be made . . . (2) by publication . . . ." In *In re Interest of A.W.*,[63] we described a "reasonably diligent" search as

> not requir[ing] the use of all possible or conceivable means of discovery, but [a]s such an inquiry as a reasonably prudent person would make in view of the circumstances [that] must extend to those places where information is likely to be obtained and to those persons who, in the ordinary course of events, would be likely to receive news of or from the absent person.

While the phrases are not identical, the context of both concerns the effort required to determine the location of an individual for the purpose of providing service. As mentioned above, components of a series or collection of statutes pertaining to a certain subject matter are in pari materia and should be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions are consistent, harmonious, and sensible.[64] Based on the similar subject matter, an argument could be made to interpret these phrases to have a similar meaning. However, these phrases are not components of a series of statutes. Instead, the context of the statutes for service under § 77-1831 is quite unique in its limitation.

As mentioned above, § 77-1832 (Reissue 2009) authorizes a tax certificate holder to serve the owner of record only *at the address where the property tax statement was mailed*. Unlike the pre-2003 amended statute—which allowed for an owner of record to be served by mail at *any* address—the limitation on service to the address where the property tax statement was mailed remains in effect under the current statutory scheme. As a result, a party's efforts to discover the actual location of an owner of record are fruitless because the tax certificate holder has no authority to serve him or her at that location.

---

[63] *In Interest of A.W.*, 224 Neb. 764, 766, 401 N.W.2d 477, 479 (1987).

[64] *In re Trust of Shire, supra* note 53.

[26,27] Nevertheless, a court must attempt to give effect to all parts of a statute, and if it can be avoided, no word, clause, or sentence will be rejected as superfluous or meaningless.[65] In this case, the Legislature has rendered the phrase "diligent inquiry" largely superfluous through its 2003 amendment to § 77-1834, but we give the phrase effect by acknowledging that it is still incumbent upon the tax certificate holder to obtain the address where the property tax statement was mailed in order to send notice by certified mail before moving to service by publication. Vandelay took this action, and the statutes do not require it to do any more.

The parties' arguments surrounding "diligent inquiry," however, do not concern the efforts required under § 77-1834 to locate the address of the owner of record. It is undisputed that Vandelay did, in fact, discover Gladys' actual address. Instead, the parties' argument, essentially, requests us to read all of the prerequisites to notice by publication, contained in § 25-517.02, into § 77-1834, under the guise of interpreting "diligent inquiry." This we cannot do. A court will not read into a statute a meaning that is not there.[66] While subjecting a tax certificate holder to the same prerequisites for service by publication as are required in § 25-517.02 might be a prudent decision for the Legislature to make, it is solely within the Legislature's purview to do so. Therefore, the parties' arguments concerning whether Vandelay took sufficient steps above those required in § 77-1832 are irrelevant.

### (ii) Owner of Record Is "Found" Only if He or She Is "Able to Be Served," Under § 77-1834

We next consider whether Vandelay was entitled to serve Gladys notice by publication after it was unable to serve her by certified mail, despite having actual knowledge of her location.

---

[65] *Woodmen of the World v. Nebraska Dept. of Rev.*, 299 Neb. 43, 907 N.W.2d 1 (2018).

[66] *State v. Gill*, 297 Neb. 852, 901 N.W.2d 679 (2017).

Whether Vandelay was able to serve Gladys by publication depends on our interpretation of the term "found."

[28-30] Generally, statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.[67] However, "'[a] statute can . . . be considered ambiguous when a particular interpretation from the face of a statute could lead to an anomalous, unusual or absurd result.'"[68] For "'[i]t is impermissible to follow a literal reading that engenders absurd consequences where there is an alternative interpretation that reasonably effects the statute's purpose.'"[69]

[31] In the exposition of statutes, the reason and intention of the lawgiver will control the strict letter of the law when the latter would lead to palpable injustice or absurdity.[70] As mentioned above, components of a series or collection of statutes pertaining to a certain subject matter are in pari materia and should be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions are consistent, harmonious, and sensible.[71]

The definition of "found," as the past tense of "find," is "I. To come upon by chance or in the course of events. . . . II. To discover or attain by search or effort."[72] Consistently with this plain meaning, the Court of Appeals interpreted "found" to mean Vandelay actually knew Gladys' address. The implication of ascribing this plain meaning to the term, however, would to a

---

[67] *Becher v. Becher*, 299 Neb. 206, 908 N.W.2d 12 (2018).

[68] *U.S. v. E.T.H.*, 833 F.3d 931, 938 (8th Cir. 2016), quoting *Breedlove v. Earthgrains Baking Companies, Inc.*, 140 F.3d 797 (8th Cir. 1998). Accord, e.g., *Dean v. State*, 288 Neb. 530, 849 N.W.2d 138 (2014).

[69] *U.S. v. E.T.H., supra* note 68, 833 F.3d at 938, quoting *Ashley, Drew & Northern Ry. v. United Transp. U.*, 625 F.2d 1357 (8th Cir. 1980).

[70] *Anthony, Inc. v. City of Omaha*, 283 Neb. 868, 813 N.W.2d 467 (2012).

[71] *In re Trust of Shire, supra* note 53.

[72] "Find," Oxford English Dictionary Online, http://www.oed.com/view/Entry/70348 (last visited Aug. 3, 2018).

large extent obviate the utility of the tax deed statutes. It would, based on the narrow service procedure in § 77-1832, preclude the holder of a tax certificate from obtaining a tax deed if an owner of record either refuses to accept a certified mailing of the notice to the address where the property tax statement was sent or lives at any other address and can be found there.

[32] We have stated that the overall objective of the certificate method for delinquent taxes is the recovery of unpaid taxes on real property.[73] As explained above, the Legislature created two separate methods for a tax certificate holder to elect to pursue to recover the taxes he or she paid on behalf of the deficient owner. Neither of these policies supports a construction of the tax deed statutes rewarding an owner, already deficient in paying taxes, by allowing him or her to force the initiation of judicial foreclosure proceedings simply by avoiding the notice, which the tax deed method was designed to provide the owner regarding his or her rights.[74] Therefore, we reject the plain meaning of "found."

[33] Vandelay, contrariwise, argues that we should interpret "found" to mean "'able to be served.'"[75] While this definition is not supported by any plain or ordinary meaning of the word, it does find support in the context of civil procedure as a legal term of art. "A 'term of art' is a word or phrase having a specific, precise meaning in a given specialty apart from its general meaning in ordinary contexts."[76] We have ascribed the term of art meaning to statutory terms when necessitated by the statute's context.[77]

---

[73] *SID No. 424, supra* note 57.

[74] *Id.*

[75] Supplemental brief for appellee on petition for further review at 27.

[76] 82 C.J.S. *Statutes* § 418 at 537 (2009).

[77] *In re Estate of Young*, No. A-96-423, 1997 WL 426191 (Neb. App. July 1, 1997) (not designated for permanent publication), citing *In re Estate of Hannan*, 246 Neb. 828, 523 N.W.2d 672 (1994). See, also, e.g., *Spady v. Spady*, 284 Neb. 885, 824 N.W.2d 366 (2012); *ATS Mobile Telephone, Inc. v. General Communications Co., Inc.*, 204 Neb. 141, 282 N.W.2d 16 (1979).

In fact, we long ascribed such a meaning to the word "found" in Neb. Rev. Stat. § 25-408 (Reissue 1985), which has since been repealed.[78] Section 25-408, in relevant part, provided: "An action . . . against a nonresident of this state or a foreign corporation may be brought in any county . . . where said defendant may be found . . . ." Regarding foreign corporations, we had held that "[a] defendant 'may be found' in any county in which proper service can be had upon its agent."[79]

Further, in other states, courts have also determined "found" to mean "'found for legal service'" in the context of civil procedure.[80] These states' venue statutes state the following: "When the defendant is a resident of the state, either in the county within which the defendant resides, or in the county within which the plaintiff resides, and the defendant may be found."[81] The Nevada Supreme Court interpreted "found," in this context, as follows:

> It is clear from the statute that the word "found" is used in contradistinction to the word "reside." The action then may be instituted by a resident of the state in a court of a county, regardless of the residence of the defendant, if it is alleged that he can be found within the county where suit is instituted and is actually served with process therein.[82]

This term of art definition of "found" also provides a harmonious construction to the tax deed statutes by giving effect to the dichotomy created by §§ 77-1832 and 77-1834 to accomplish the service requirement of § 77-1831. Under this construction, a tax certificate holder must attempt to serve

---

[78] See 1986 Neb. Laws, L.B. 529, § 58.

[79] *Mittelstadt v. Rouzer*, 213 Neb. 178, 181, 328 N.W.2d 467, 469 (1982), quoting *Juckett v. Brennaman*, 99 Neb. 755, 157 N.W. 925 (1916).

[80] *Shields v. Shields*, 115 Mont. 146, 155, 139 P.2d 528, 530 (1943). Accord *State ex rel. Ford Motor Co. v. Manners*, 161 S.W.3d 373 (Mo. 2005).

[81] See, e.g., Mo. Ann. Stat. § 508.010(1) (West Cum. Supp. 2018). Accord Miss. Code Ann. § 93-5-11 (2013).

[82] *Tiedemann v. Tiedemann*, 36 Nev. 494, 500-501, 137 P. 824, 826 (1913).

the owner of record under the requirements of § 77-1832, but, if such service is impossible or unsuccessful, then the tax certificate holder may provide service by publication. Such an interpretation gives effect to the statutory requirements while retaining the overall viability of the tax deed statutes as a whole.

[34,35] Therefore, we hold that the word "found" in § 77-1834 means "able to be served." Accordingly, we hold that § 77-1834 authorizes a tax certificate holder to provide service by publication to an owner of record who was not able to be served by certified mail at the address where the property tax statement was mailed, upon proof of compliance with § 77-1832 if the owner, in fact, lives at such address.

In this case, Vandelay obtained the address where Gladys received the property tax statements for the property. It then sent notice by certified mail, return receipt requested, which notice was returned as "unclaimed" after three failed attempts at delivery. Vandelay submitted this into evidence along with an affidavit of its efforts to comply with § 77-1832, as required by § 77-1833 (Cum. Supp. 2012). This constituted complete compliance with the requirements of § 77-1832, and because Gladys was not able to be served in this manner, Vandelay appropriately proceeded with service by publication. Therefore, we find the Court of Appeals' determination that Vandelay was not entitled to serve Gladys by publication erroneous.

[36] Before we reverse the Court of Appeals' decision, however, we consider Robin's alternative argument before the Court of Appeals that the tax deed was void because Vandelay failed to comply with the publication requirements, which the Court of Appeals did not reach. Upon further review from a judgment of the Court of Appeals, the Nebraska Supreme Court will not reverse a judgment which it deems to be correct simply because its reasoning differs from that employed by the Court of Appeals.[83]

---

[83] *In re Estate of Clinger*, 292 Neb. 237, 872 N.W.2d 37 (2015).

### (b) Vandelay Complied With Publication
### Requirements of § 77-1834

Robin argues Vandelay's proof of publication did not comply with § 77-1835 because it did not say the Courier-Times newspaper was in general circulation *in the county* and because he offered evidence the Courier-Times was not, in fact, in circulation throughout Lincoln County. Further, Robin contends Vandelay did not comply with § 77-1834 because there was another Lincoln County newspaper Gladys was more likely to see.

As mentioned above, § 77-1834, in relevant part, provides that "the purchaser or his or her assignee shall publish the notice in some newspaper published in the county and having a general circulation in the county." Section 77-1835, in relevant part, states:

> Proof of publication shall be made by filing in the county treasurer's office the affidavit of the publisher, manager, or other employee of such newspaper, that to his or her personal knowledge, the notice was published for the time and in the manner provided in this section, setting out a copy of the notice and the date upon which the same was published.

[37] There is no requirement in the preceding sections that specific language must appear in a proof of publication. Instead, the proof of publication needs to state only that notice was published in the manner provided in § 77-1834. In addition, Neb. Rev. Stat. § 25-523 (Reissue 2016) defines a "legal newspaper" for the publication of legal and other official notice as one which has a "bona fide circulation of at least three hundred paid subscriptions weekly, and shall have been published within the county for fifty-two successive weeks prior to the publication of such notice, and be printed, either in whole or in part, in an office maintained at the place of publication."

The proof of publication sufficiently stated that the Courier-Times is a legal newspaper having a bona fide circulation of at

least 300 paid weekly subscriptions and that it had been published within the county for 52 consecutive weeks prior to the publication of such notice.

[38] Robin also failed to produce sufficient evidence the Courier-Times was not, in fact, in general circulation in Lincoln County. In the absence of a sufficient showing to the contrary, the affidavit of the publisher that a newspaper was one of general circulation in the county must be held sufficient to establish the fact.[84]

[39] Robin submitted evidence that the Courier-Times had only 1,300 weekly subscriptions among three villages within Lincoln County. However, absent anything to the contrary, statutory language is to be given its plain meaning, and a court will not look beyond the statute or interpret it when the meaning of its words is plain, direct, and unambiguous.[85] The plain meaning of the word "in," in § 77-1834, shows that the newspaper only needed to be generally circulated within Lincoln County, not throughout the entire county, as Robin argues.

Robin's evidence does not constitute sufficient evidence that the Courier-Times was not a legal newspaper in general circulation in Lincoln County.

Robin also produced evidence another newspaper published in Lincoln County had greater circulation throughout the county and, specifically, in the ZIP code where Gladys and the property were located. He argues that Vandelay did not satisfy the publication requirement by not publishing the notice in this newspaper, by reading some type of good faith requirement into § 77-1834. However, § 77-1834 does not require publication in the newspaper of *greatest* circulation in the county, and we will not impose such a requirement. As mentioned above, a court will not read into a statute a meaning that is not there.[86]

---

[84] See *Bourke v. Somers*, 3 Neb. (Unoff.) 761, 92 N.W. 990 (1902).

[85] *In re Trust of Shire, supra* note 53.

[86] *State v. Gill, supra* note 66.

Nevertheless, Robin directs us to *State, ex rel. Elliott, v. Holliday*,[87] where in 1892, we stated: "Legal advertisements should not be inserted in an obscure paper where the probabilities are that they will be seen by but few, where there is a paper of general circulation in the county, because the object of the law will be in part at least defeated." In *Holliday*, we were considering a sheriff's refusal to publish mortgage foreclosure sale notices in any newspaper except the one published by his political party, which newspaper was alleged to have been "'of such small circulation as in effect to utterly defeat the object of the law.'"[88] We do not foreclose the possibility that there is some threshold requirement for the circulation of a newspaper to satisfy the requirements of § 77-1834, but *Holliday* is inapplicable here, where, as we stated above, Robin has not presented sufficient evidence to overcome the statutory presumption that § 77-1834 was complied with.

Because we conclude Robin did not overcome the presumption Vandelay complied with the statutory notice requirements to show Vandelay's tax deed is void, we must reverse the decision of the Court of Appeals.

[40] Upon reversing a decision of the Court of Appeals, we may consider, as we deem appropriate, some or all of the assignments of error the Court of Appeals did not reach.[89] Because the Court of Appeals determined that Vandelay's tax deed was void, it did not consider whether Gladys had a mental disorder entitling Robin to redeem the property under the expanded statutory period or whether equity requires the protection of Robin's interests. The district court fully decided these issues, and the meaning of "mental disorder," under § 77-1827, is a matter of first impression. Thus, we elect to consider these assignments of error.

---

[87] *State, ex rel. Elliott, v. Holliday*, 35 Neb. 327, 333, 53 N.W. 142, 144 (1892).

[88] *Id.* at 331, 53 N.W. at 143.

[89] *Burns v. Burns*, 293 Neb. 633, 879 N.W.2d 375 (2016).

### 3. Robin Failed to Prove He Was Entitled to Extended Redemption Period in § 77-1827

Robin argues that he was entitled to redeem the property because Gladys suffered from a mental disorder that extended the statutory redemption period and because Vandelay admitted that Robin had tendered redemption to the county treasurer. He argues that the district court erred in not finding Gladys had a mental disorder by relying on Vandelay's expert, who never examined Gladys and only selectively reviewed her medical records, over her long-term physician.

Vandelay argues that the evidence was insufficient to prove Gladys had a mental disorder affecting her ability to make legal decisions and that we should defer to the lower court's factual finding that Vandelay's expert was more credible than Gladys' physician, whose testimony was not supported by his own medical records.

[41] In order to defeat a tax deed, a party must show that it satisfied the conditions precedent in § 77-1843. One of the options to satisfy § 77-1843 includes proving that (1) the property has been redeemed from the sale and (2) such redemption was had or made for the use and benefit of persons having the right of redemption under the laws of this state. As discussed above, Vandelay admitted that Robin tendered redemption to the county treasurer, which is sufficient to satisfy that condition.

Though we are aware that in 2013, the Legislature revised § 77-1827 to replace the term "mental retardation" with the term "intellectual disability," for purposes of this matter we quote from the version of the statute in place during the relevant period of this controversy. The 2009 version states: "The real property of persons with mental retardation or a mental disorder so sold, or any interest they may have in real property sold for taxes, may be redeemed at any time within five years after such sale."[90] There is no contention that Gladys suffered

---

[90] § 77-1827 (Reissue 2009).

from the first condition, so we consider only whether she suffered from the second condition.

[42,43] The language of the statute indicates that the extended redemption period for a mental disorder exists if the owner had a mental disorder at the time of the property's sale. Contrariwise, interpreting the statute to extend the redemption period for an individual who only later develops a mental disorder within the 5-year period provided therein would be absurd because such an individual could not reobtain the right to redeem the property after a tax deed had been validly issued. In interpreting a statute, a court is guided by the presumption that the Legislature intended a sensible rather than absurd result in enacting the statute.[91] Accordingly, we restrict our analysis to whether Gladys had a mental disorder in March 2011.

At trial, each party called an expert witness concerning Gladys' mental state. The witnesses agreed that a mental disorder is, as characterized by Vandelay's expert, "marked primarily by sufficient disorganization of personality, mind and emotions to seriously impair the normal psychological functioning of the individual."

Robin called Dr. Ronald Asher, who provided Gladys' medical care beginning in at least 2006. He stated that an MRI record in his 2006 records indicated Gladys had vascular disease in her brain, which causes small strokes. He described Gladys' mental functioning as starting at a normal level in 2006 but slowly deteriorating until the time of her death, when she was mostly bedridden. Asher explained that Gladys' deterioration was a "step-wise progression," where she would suffer a small stroke impairing her mental status for 7 to 10 days before she recovered to a level slightly worse than before the stroke.

Asher opined Gladys had a mental disorder and dementia from at least 2009 until her death, but he could not determine exactly when she developed the mental disorder. He

---

[91] *Burns v. Burns*, 296 Neb. 184, 892 N.W.2d 135 (2017).

explained she was unable to understand complicated issues, make appropriate judgments, or manage financial matters—beyond writing checks and simple cash management. While Asher never performed any psychological testing or prescribed Gladys dementia medication, he explained she had never suffered any behavioral issues warranting intervention. Finally, he acknowledged his notes from June 2012, "I thought [her] mental status was good," and May 2015, "mental status reassuring," but explained the notes were relative to her status during that period.

Robin and one of his sisters provided anecdotal testimony about Gladys' false memories and lack of reasoning, which were consistent with the symptoms of a mental disorder as described by the experts. Robin also testified that Gladys' mental condition gradually declined but that the most significant change occurred after she was hospitalized for a fall in December 2013.

Regarding Gladys' ability to handle her affairs, Robin and his sister stated that Gladys tended to keep all documents and mail she received and that they found records from doctor appointments, letters from Social Security, various bills, junk mail, and a handicapped parking pass Gladys claimed to have thrown away, but no property tax statements. Robin also stated Gladys asked him about her bills frequently after 2009 to make sure they were being paid. Robin testified he confirmed with the retirement community staff that Gladys continued to receive her mail throughout her time living there.

Dr. John Goldner, a neurologist, testified for Vandelay after conducting a comprehensive review of Gladys' medical records. Specifically, he relied on Asher's notes, the absence of psychological testing and prescriptions treating dementia, and the daily notes from the retirement community—describing Gladys as alert, orientated, and able to make her needs known and make her own decisions, through 2013. Goldner testified that Asher's notes indicated that in April 2013, Gladys suffered from decreased memory, and that then in December 2013, Gladys moved from a residential unit to the assisted living

unit at the retirement community because she required a higher level of care. He testified that at Gladys' age, it was possible that her functioning could be deficient enough to be considered a mental disorder on certain days, but that she appeared to generally be able to function within normal limits for her advanced age, which is not de facto a mental disorder. He testified Gladys' functioning could not be classified as a mental disorder before mid-2014, at which point her mental capacity was inconclusive.

The court determined that Asher's records did not support his conclusions that Gladys had a mental disorder. It concluded Robin failed to prove Gladys had a mental disorder, relying on Goldner's testimony that Gladys did not suffer from a mental disorder any time before mid-2014, the evidence that any mental decline she was experiencing was not out of line with other individuals her age, and the fact that she was never tested for a mental condition or placed on medication for dementia.

We have not previously interpreted the term "mental disorder" in the context of § 77-1827 (Cum. Supp. 2016). We have, however, interpreted that same phrase in the context of statutory limitations on certain actions. Neb. Rev. Stat. § 25-213 (Reissue 2016), in relevant part, provides:

> [I]f a person entitled to bring any action [under listed statutes] for the recovery of the title or possession of lands, tenements, or hereditaments, or for the foreclosure of mortgages thereon, is, at the time the cause of action accrued . . . a person with a mental disorder . . . every such person shall be entitled to bring such action within the respective times . . . after such disability is removed.

[44] In *Maycock v. Hoody*,[92] we adopted the definition of "mental disorder" employed by the Court of Appeals, reasoning it was consistent with our interpretation of a previous version of the statute.[93] We stated:

---

[92] *Maycock v. Hoody*, 281 Neb. 767, 799 N.W.2d 322 (2011).

[93] See *Sacchi v. Blodig*, 215 Neb. 817, 341 N.W.2d 326 (1983).

[A] person with a mental disorder under § 25-213 is "one who suffers from a condition of mental derangement which actually prevents the sufferer from understanding his or her legal rights or from instituting legal action[,]" and . . . a mental disorder within the meaning of § 25-213 is "an incapacity which disqualifies one from acting for the protection of one's rights."[94]

Because both § 77-1827 and § 25-213 relate to extending the time required to exercise a legal right for an individual suffering from a mental disorder, we interpret the meaning of the term "mental disorder" consistently among them.

While we review factual issues de novo on the record, we give deference to the fact that the trial court observed the testimony of the experts and Wisner family members. The court determined that Goldner's testimony was more credible than Asher's and the Wisners' because of the contradiction with Asher's records and lack of anyone requesting psychological testing for Gladys.

The definition of a mental disorder provided by the experts appears to be broader than the standard required by the statute. Accordingly, Goldner's opinion that Gladys did not suffer from any mental disorder before mid-2014 strongly supports not finding Gladys to have had a mental disorder in March 2011, while Asher's contrary opinion did not contain a precise conclusion regarding her ability to understand and protect her legal rights.

Both Asher and Robin described Gladys' mental condition as a slow decline. Asher could not pinpoint when Gladys developed a mental disorder but concluded it was in at least 2009 despite a general consensus that her greatest decline in functioning occurred in December 2013. While Asher stated that Gladys had a decreased ability to make judgments and understand complex issues since 2009, Robin stated that she remained vigilant regarding her financial obligations, and

---

[94] *Maycock, supra* note 92, 281 Neb. at 776, 799 N.W.2d at 329, quoting *Vergara v. Lopez-Vasquez*, 1 Neb. App. 1141, 510 N.W.2d 550 (1993).

the June 2011 newspaper article indicated that typically, she was still functioning near her normal capacity—engaging in weekly card games with friends and reading. Finally, Asher's note from June 2012 does not provide any support for his conclusion that she had a mental disorder, even if it was only describing her relative status.

Based on the district court's credibility determination and our independent review of the evidence, we conclude Robin failed to prove Gladys suffered from a mental disorder in March 2011. Therefore, her right to redeem the property expired when the county treasurer delivered the tax deed to Vandelay.

### 4. EQUITIES OF CASE DO NOT FAVOR ROBIN

Robin argues the equities of this situation warrant this court's permitting him to redeem the property, even if the law does not. He argues the undisputed evidence is that Gladys was a 95-year-old widow in a retirement community with no local family and at least some diminished mental capacity. Conversely, he argues Vandelay chose to pursue the less arduous process for a tax deed and did only the bare minimum required by the tax deed statutes, in bad faith to deprive Gladys of her property at a significant windfall.

The parties dispute whether we may provide an equitable remedy at all when the situation is governed by a comprehensive, rigid statutory structure. We need not decide this issue, because even assuming, without deciding, that we could craft some type of relief for Robin, his characterization of the equities of the situation strongly distorts the reality of this case.

[45] Equity strives to do justice; it is not a rigid concept, but, instead, is determined on a case-by-case basis according to concepts of justice and fairness.[95] But "'equity follows the law to the extent of obeying it and conforming to its general rules and policies whether contained in common law or

---

[95] *Floral Lawns Memorial Gardens Assn. v. Becker*, 284 Neb. 532, 822 N.W.2d 692 (2012).

statute.'"[96] This maxim is strictly applicable whenever the rights of the parties are clearly defined and established by law.[97] Also, equitable remedies are generally not available where there exists an adequate remedy at law.[98]

When Roger died in 2009, Robin took responsibility over managing Gladys' affairs. He passed this responsibility to the trust department of a bank but, apparently, overlooked the property taxes due on the property. Further, his own testimony provided that he did not monitor Gladys' finances, despite her persistent concern about her bills' being paid. Additionally, while Gladys was stated to have retained all of her mail, even junk mail, she apparently disposed of her repeated notices by Lincoln County and Vandelay regarding her property tax deficiency.

Steps could have been taken to ensure that Gladys' affairs were being addressed. When Gladys moved to the retirement community in 2009, her address of record was changed with the relevant agencies. Robin, as the holder of Gladys' power of attorney, could have directed that all of Gladys' mail be sent to him. He could have had the lease on the property recorded with the register of deeds to allow additional notices to be sent to the tenant. He could have paid the real estate taxes or authorized the trust department to pay the real estate taxes. He could have sought to have her mental capacity tested, and if Gladys was found to be impaired by reason of disability, he could have sought a conservatorship for her. However, Robin failed to take any one of the steps to ensure the real estate taxes were paid.

Despite the harsh result in this matter, the Legislature has established strict rules for the payment of real estate taxes and ramifications for the failure to pay those taxes. Vandelay complied with those statutory requirements to obtain a tax deed on validly purchased tax certificates. Despite Robin's arguments

---

[96] *Jeffrey B. v. Amy L.*, 283 Neb. 940, 949, 814 N.W.2d 737, 745 (2012).

[97] *Id.*

[98] *Jeffrey B. v. Amy L., supra* note 96.

that it did the bare minimum required, Vandelay, in fact, researched where to find Gladys; sent Gladys, by certified mail to her correct address, notice that an application for a tax deed would be made; published notice of the application in a legal newspaper of general circulation in Lincoln County; and sent the notice of publication to Gladys by first-class mail. The last step of mailing the notice of the publication by first-class mail was not statutorily required and was made by Vandelay out of an abundance of caution to ensure Gladys was not deprived of the due process rights in her property.

Hence, the equities of this situation do not favor Robin, and this assignment of error is without merit.

## V. CONCLUSION

Despite Robin's standing to challenge Vandelay's tax deed, we conclude Robin failed to present sufficient evidence to either overcome the presumption Vandelay provided Gladys with sufficient service, as required to obtain a valid tax deed, or prove Gladys suffered from a mental disorder at the time of her property's tax sale, extending her statutory redemption period. In addition, the tax certificate statutes enacted by the Legislature establish a specific process upon the failure to pay real estate taxes which does not take into consideration the amount of the delinquent tax compared to the value of the property. As a result, we determine the record in this case does not support providing Robin with a remedy he was not entitled to under the statutes. Therefore, we reverse the decision of the Court of Appeals and remand the cause with directions that the Court of Appeals affirm the judgment of the district court.

REVERSED AND REMANDED WITH DIRECTIONS.

WRIGHT and KELCH, JJ., not participating.

CASSEL, J., dissenting in part.

This court's admittedly "harsh" result flows from the district court's single failure, amidst an otherwise thorough and correct analysis, to see the forest for the trees. The district court

rejected Gladys' estate's attempt to redeem the property based on an extended redemption period authorized where a taxpayer suffers from a "mental disorder."[1] The ultimate question here is not whether Vandelay is entitled to all of the taxes, fees, and costs that it paid, together with all of the interest imposed pursuant to a high statutory rate designed to encourage prompt payment of real estate taxes. Rather, the question is whether, despite a remedy expressly authorized by the Legislature's "strict rules" in anticipation of this situation, Vandelay should reap a windfall at the expense of an extremely elderly taxpayer lacking the capacity to take action to protect her rights. Because I conclude that Gladys was entitled to the extended redemption period and that equity demands its implementation, I respectfully dissent.

In all respects but one, the district court rendered an extensive, well-researched, and well-written judgment. On appeal, the Court of Appeals concentrated on the complicated tax deed method statutes and did not reach the essential issue. On further review, my colleagues have almost everything right. I agree with this court's conclusions that Robin had standing to challenge the tax deed and that Vandelay substantially complied with the statutory notice requirements for a tax deed, and with all of this court's reasoning leading to those conclusions. The court's analysis regarding those matters is spot on. Only where the court turns to the statutory right of redemption do I part its company.

This court acknowledges that both parties assert claims for quiet title, which sound in equity. As this court's opinion admits, equity strives to do justice determined on a case-by-case basis according to concepts of justice and fairness. This court recites the correct standard of review—trying factual questions de novo on the record and, as to questions of both law and fact, reaching an independent conclusion from that of the district court.

---

[1] See Neb. Rev. Stat. § 77-1827 (Cum. Supp. 2016).

Regarding whether Gladys suffered from a mental disorder during the pertinent timeframe, I assert that this court should give no weight to the district court's observation of the two medical experts. Our standard of review does not demand deference to the district court in any respect. It is purely within this court's discretion. Here, none is due, for two reasons. First, the testimony of Vandelay's expert was presented by deposition. As to that physician, the district court was in no better position than this court to make credibility assessments. Second, where I believe the district court went wrong had little to do with its observations of Robin's expert, who was Gladys' treating physician.

I accept this court's definition of "mental disorder,"[2] which the district court also employed. Thus, a mental disorder in this context is "'an incapacity which disqualifies one from acting for the protection of one's rights.'"[3]

Several facts set the stage, which is essential to an assessment of Gladys' capacity to protect her rights. She went to live at a retirement community in 2009, the year she turned age 93. She moved there after the deaths of her husband in 2007 and her son Roger in 2009. The district court recognized that "Gladys was generally unfamiliar with financial matters and did not pay her own bills." When she entered the facility, she initially lived in the residential section. By the time the tax sale certificates were sold in 2011, she was 94 years old. In late 2013, at age 97, she suffered a number of falls. Because she was no longer ambulatory, she was moved to the facility's assisted living section. By March 2014, as she approached the age of 98, she was, as the district court found, suffering from numerous chronic medical issues and having difficulty with her memory, particularly in recalling names, and with complicated tasks.

---

[2] § 77-1827.

[3] *Maycock v. Hoody*, 281 Neb. 767, 776, 799 N.W.2d 322, 329 (2011).

Both the district court and this court relied on medical records kept for a significantly different purpose—to guide her caregivers at the facility. Her caregivers were not recording assessments of her understanding and ability to protect her rights in financial matters. They were concerned with her day-to-day well-being. Thus, it is no surprise that the records showed that "she was having no behavioral issues, was kind and easy to get along with, was oriented to time, person and place, was alert and cooperative, was capable of performing simple tasks, and displayed a fairly consistent pattern of normal intellectual behavior." Vandelay's expert relied solely on these medical records. He never met or observed Gladys. His testimony provides no significant insight into Gladys' capacity to protect her rights.

In contrast, Gladys' longtime physician testified to personal observations and conclusions, over an extended period, directly bearing on Gladys' incapacity which disqualified her from acting for the protection of her rights. He observed in 2006 that she had episodes of confusion and disorientation. Those were typically associated with findings suggesting small strokes—where imaging studies showed evidence of "white matter changes," that is, "ischemic injury."

When Gladys moved to the facility in 2009, her doctor observed that she was "not really able to make good judgments." He explained, "You could ask her questions and she would give a good response, but if you asked detail, if you . . . asked her to make judgments, she really wasn't able to do that very well." He opined that "over time what you could see is that she became less capable."

From 2009 until the time of Gladys' death, her doctor saw her about every 60 days. Her doctor recalled a "fairly steady but gradual deterioration in how well she did." From his observations, he described a "step-wise decrease in her . . . functional capacity," which he characterized as "more mental than physical." He described her ability to do "simple things," such as "describe that she needed to go to the bathroom, she

was hungry, she was tired." But he opined that her ability to understand business or financial matters from 2009 on was "very limited." He opined that her ability to organize information also was "very limited." He opined that she suffered from a "disorganization of the mind" from 2009 forward. And he opined that her cognitive capacity from 2009 forward showed that her "ability to deal with anything that was beyond simple was not something that she could do." With respect to her reasoning and memory, he opined that "anything that was . . . complicated would be beyond what she would be able to manage." Ultimately, Gladys' doctor opined that from 2009 to the time of her death, she suffered from a "mental disorder." He characterized it as "multi-infarct dementia," that is, "multiple small strokes which . . . progressively knock out sections of brain."

The district court recognized that the question of whether by 2014 Gladys suffered from a mental disorder in the statutory sense was "more difficult." It acknowledged that by the spring of 2014, there "had been a decline in Gladys' cognitive and mental status."

But then the district court missed the forest, stating that the "evidence [did] not establish that her decline was *out of the normal range for a person of her age*." (Emphasis supplied.) It defies reason and common sense to ignore the impact of extremely advanced age on mental ability. And coupled with the testimony of her doctor, supported by imaging showing repeated small strokes over a period of years, I cannot agree that Gladys had the capacity to act for the protection of her own rights in the payment of real estate taxes.

Because I conclude that a de novo review supports the existence of a "mental disorder" as contemplated by § 77-1827 at the relevant time, I would modify the Court of Appeals' decision and direct that court to reverse the judgment of the district court and remand the cause with directions to quiet title in Gladys' estate upon payment by the estate into court of all taxes, costs, and fees paid by Vandelay, together with statutory

interest (14 percent per annum) to the time of payment into court, to be disbursed to Vandelay in redemption of its tax deed and the underlying tax sale certificate.

I reiterate that Vandelay is entitled to the full benefit of the payments required for redemption. But Gladys (and now, her estate) is no less entitled to justice. That was the exact purpose of the statutory extended redemption period. And the failure to implement that statute permits Vandelay to reap a windfall that borders on the obscene. Because I believe that the windfall is an unjust result contrary to statute, I respectfully dissent.