NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0644n.06

No. 16-1971

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Dec 02, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| JOSEPH MELCHER, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Before: McKEAGUE, GRIFFIN, and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. A jury convicted Joseph Melcher of conducting an illegal gambling business in violation of 18 U.S.C. § 1955. Melcher now challenges his conviction on five grounds. We affirm.

I.

Thomas Mackey ran a sports gambling website called Betchopper.com. Around 2010, Mackey met Joseph Melcher at a bar. Soon thereafter Melcher began to bet through Mackey's site. Mackey eventually invited Melcher to join the business, urging him to recruit new bettors and offering to let him keep 15% of their losses. Melcher agreed, recruited two people, and began serving as a middleman between them and Mackey. Melcher's primary duty was to collect money from, or deliver money to, the bettors whenever their losses, or winnings, exceeded $500.

Unbeknownst to Mackey and Melcher, the FBI had been investigating Betchopper since 2009. As part of that investigation, the FBI wiretapped two of Mackey's phones and intercepted three calls between Mackey and Melcher. In the first call, Mackey ordered Melcher to get in touch with one of the bettors because the bettor had not made a wager in the past week. In the second call, Mackey and Melcher discussed cash that Mackey wanted to drop off at Melcher's house. In the third call, Melcher relayed a bettor's request to "shoot dimes" on credit—that is, place $1,000 bets without having to pay cash up front. The FBI also recovered text messages, in which Melcher asked Mackey to give one of the bettors more time to settle his debts.

Based on those calls and texts, the FBI decided to interview Melcher. Agents Lewis Fischetti and Marc Silski drove to Melcher's house on May 14, 2014. There, they spotted a man walking through Melcher's yard to the street in front of his house. They asked the man if he was "Joe," but he responded that he was "just the landscaper." The man then got in his car and drove off. That same man returned minutes later, however, and admitted that he was Joseph Melcher. Fischetti and Silski introduced themselves as FBI agents, and asked if they could speak to him. Melcher agreed and invited the agents inside. The three of them sat down in the living room to talk. The agents did not read Melcher his *Miranda* rights.

After some small talk, the agents asked Melcher about Mackey and Betchopper. Melcher admitted the following: that he used the site to bet, that he recruited two bettors for Mackey, that he got a cut of the bettors' losses, and that he passed money and messages between the bettors and Mackey. The interview lasted about 30 minutes. During that time, the agents never restrained Melcher, threatened him with arrest or prosecution, or ordered him to answer their questions. They also never told him that he could refuse to answer.

A grand jury thereafter charged Mackey, Melcher, and several other Betchopper employees with conducting an illegal gambling business, in violation of 18 U.S.C. § 1955, and with conspiracy to conduct an illegal gambling business, in violation of 18 U.S.C. § 371. Before trial, Melcher moved to suppress his statements to the FBI agents, arguing that he had been "in custody" when they questioned him and that they therefore violated his Fifth Amendment rights by failing to Mirandize him. The district court held that Melcher had not been "in custody," and denied his motion.

At trial, the Government introduced evidence of the calls and texts that Mackey and Melcher had exchanged. The Government also called Agent Silski and another agent, Brian Davis, who testified as an expert on gambling organizations. Agent Silski testified to Melcher's confession. Agent Davis testified to Mackey and Melcher's respective roles in the Betchopper business: Mackey was the boss or "bookmaker" and Melcher was an "agent" or "runner." Melcher objected to that testimony, asserting that Davis had offered an improper legal conclusion, but the district court overruled the objection.

Melcher opted to testify. He first denied confessing to the FBI. He then explained why he had initially lied to the agents about his identity. Melcher claimed that he was in debt, that he thought the agents were bill collectors, and that he drove away because he did not want to be hassled about the money he owed.

In rebuttal closing, the prosecutor argued that the jury should not believe Melcher's explanation for lying to the FBI. If Melcher had really been in debt, the prosecutor said, he could have produced evidence to that effect: a "bill that was overdue" or a "couple bill collectors [that had] showed up in his driveway." Without that evidence, the prosecutor continued,

Melcher's story was uncorroborated and therefore not "worth believing." Melcher objected that the prosecutor had improperly shifted the burden of proof, but the court overruled the objection.

The district court then instructed the jury that, to convict Melcher under § 1955, they needed to find that he had "knowingly conducted, financed, managed, supervised, directed, or owned" Betchopper. The district court defined "conduct" as "perform[ing] any act, function, or duty which is necessary or helpful in the regular business of the business." The jury convicted Melcher under § 1955, but acquitted him of the conspiracy charge. Melcher now appeals his conviction.

II.

A.

Melcher challenges his conviction on five grounds. He first argues that the district court should have suppressed his confession because Agents Fischetti and Silski placed him "in custody" and then questioned him without issuing *Miranda* warnings. Melcher raised this argument in his pretrial motion to suppress, thereby preserving his objection. We therefore review the district court's factual findings for clear error, and its legal conclusions de novo. *United States v. Calvetti*, 836 F.3d 654, 661 (6th Cir. 2016).

Police must give *Miranda* warnings only if a suspect is "in custody." *Stansbury v. California*, 511 U.S. 318, 322 (1994). A suspect is in custody if police have either arrested him or restricted his freedom of movement as though he were under arrest. *Id.* The test for custody is objective; courts ask how a "reasonable person in the [suspect's] position" would "gauge the breadth of his . . . freedom of action." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009). To answer that question, courts look to "all of the circumstances" surrounding the interview, paying special mind to the following four factors: where the interview was conducted; the

duration and manner of the officers' questioning; whether the officers restrained the suspect's movement; and whether they told him he could refuse to be interviewed. *Id*.

Here, the agents interviewed Melcher in his home. That fact itself is a near-knockout blow to Melcher's argument, because "an in-home encounter between the police and a citizen will generally be non-custodial." *Id.* at 466. And none of the other *Panak* factors let Melcher off the ropes. The interview was short—about thirty minutes long. And the manner of questioning was "pretty friendly," at least in Melcher's estimation. [R. 246 at PageID 1736.] Moreover, the agents did not restrain Melcher in any way. Melcher responds that the agents were armed, but concedes that they never drew their weapons. He is therefore stuck arguing that a holstered gun is a restraint that turns an otherwise non-custodial interview into a custodial one. Were that true, every traffic stop would require *Miranda* warnings, and the Supreme Court has clearly said that is not so. *Berkemer v. McCarty*, 468 U.S. 420, 435-41 (1984). We therefore reject Melcher's argument that the agents' holstered guns constituted restraints that placed him "in custody."

Admittedly, the last *Panak* factor favors Melcher because the agents never told him that he could refuse to be interviewed. But where the first three factors support the Government, the fourth carries little weight. *See* 552 F.3d at 467. Standing alone, then, the agents' failure to advise him that he could remain silent did not place him "in custody."

Melcher's final arguments emphasize what he and the agents were thinking at the time of the interview. The agents viewed him as a suspect, he says, and he viewed the interview as mandatory. Those arguments fail because the custody determination does not turn on the subjective thoughts of either party, police or suspect. *Stansbury*, 511 U.S. at 324. Thus, the district court did not err by denying Melcher's suppression motion.

B.

Melcher's next two arguments are related: he says the district court misinstructed the jury on the "conduct" element of the § 1955 charge, and that as a result the jury convicted him even though the Government did not present sufficient evidence that he "conducted" the Betchopper business. Melcher did not object to the jury instructions, nor did he move for a judgment of acquittal at the close of evidence. We therefore review both the instructions and the sufficiency of the evidence for plain error. *United States v. Tragas*, 727 F.3d 610, 616-18 (6th Cir. 2013).

18 U.S.C. § 1955 subjects anyone who "conducts . . . all or part of an illegal gambling business" to criminal penalties. Melcher asserts that, in this context, "conduct" means "to provide regular aid to." Under that definition, the Government presented insufficient evidence, Melcher says, because they only proved that he helped the business once by setting up a Betchopper account for a family friend. And under that definition, the jury instructions were also flawed, Melcher continues, because in defining "conduct" the court made no mention of any regularity requirement.

We begin with Melcher's sufficiency claim. Again, we are reviewing for plain error, so we must affirm unless "the record is devoid of evidence pointing to guilt." *Tragas*, 727 F.3d at 618. Here, Melcher admitted that he recruited two bettors to the business and served as a liaison between them and Mackey. He also confessed to passing money back and forth, paying (or collecting from) the bettors whenever their winnings (or losses) exceeded $500. And (as the call logs and text records show) he relayed messages between Mackey and the bettors, urging the bettors to gamble more and asking Mackey to increase the bettors' credit limits and extend their payment deadlines. Thus, far from being devoid of evidence, the record contains ample proof

that Melcher "provided regular aid to" the Betchopper business.  Melcher's sufficiency claim therefore fails.

Melcher's argument about the jury instructions fails for the same reason.  Under plain-error review, a defendant must prove that an error "prejudiced" him, meaning that it "affected the outcome of [his] district court proceedings."  *United States v. Olano*, 507 U.S. 725, 734 (1993).  Here, even if the court had explicitly instructed the jury that "conduct" means to "provide regular aid to," the jury could have considered the evidence discussed above and concluded that the Government had met its burden.  Melcher is therefore not entitled to relief.

C.

Melcher next argues that the district court erred by allowing Agent Davis to testify to legal conclusions.  We review the district court's decision to admit expert testimony for abuse of discretion.  *United States v. Nixon*, 694 F.3d 623, 628 (6th Cir. 2012).

Rule 702 prohibits expert witnesses from testifying to legal conclusions.  *See id.* at 632.  An expert offers a legal conclusion when he defines the governing legal standard or applies the standard to the facts of the case.  *See Torres v. Cty. of Oakland*, 758 F.2d 147, 150-51 (6th Cir. 1985).

Here, Davis did neither.  He did not attempt to define statutory terms like "illegal gambling business."  Nor did he apply the statutory standard by, for example, opining that Melcher had "conducted" the business.  Instead, he testified to what "bookmakers" and "agents" typically do, discussed Mackey and Melcher's conduct, and labeled them as a "bookmaker" and an "agent," respectively.

Melcher takes issue with that testimony for two reasons.  First, he suggests that, because "agent" can be a legal term of art, an expert can never use the term in expressing his opinions.

But that is not the law.  If a term is not part of the governing legal standard, then an expert does not apply the law by using the term.  *Nixon*, 694 F.3d at 631.  For that reason, an expert may use words that are common in legal parlance—words like "conversion," "embezzlement," and "forged"—so long as they are "not used in defining the crimes that [the defendant] is charged with."  *Id*.  Here, § 1955 does not use the term "agent," and thus Davis could use the term without offering a legal conclusion.

Second, Melcher complains that the implication of Davis's testimony was that Melcher "conducted" the gambling business, even if Davis did not say so explicitly.  An expert can "suggest the answer[s]" to legal questions, and "give the jury all the information" it needs to come to legal conclusions of its own.  *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994).  That is what Davis did here.  His opinions were therefore admissible under Rule 702.

D.

Finally, Melcher argues that, in closing argument, the Government improperly shifted its burden of proof to him.  We review claims of alleged prosecutorial misconduct de novo.  *United States v. Collins*, 799 F.3d 554, 586-87 (6th Cir. 2015).

Melcher takes issue with the Government's response to his argument about why he initially avoided Agents Fischetti and Silski.  As noted above, Melcher testified that, when he first saw the agents, he thought they were bill collectors.  In closing argument, the prosecutor responded that, if Melcher had really been in debt, he could have proved it by producing "one bill that was overdue" or "a couple bill collectors [that had] showed up in his driveway."  That argument, Melcher asserts, saddled him with a burden to prove his innocence.

As a general matter, the Government may comment on a defendant's failure to call witnesses or produce evidence in support of his own defense theory.  *United States v. Tarwater*,

308 F.3d 494, 511 (6th Cir. 2002). But there are two exceptions to that rule. First, where a defendant invokes his right to silence, the Government may not "tax the exercise" of that right by arguing that the defense should have produced evidence that the defendant could provide only by testifying. *Id.* Second, when the Government points out missing evidence, it may not suggest that the defendant had "any obligation to produce evidence to prove his innocence." *United States v. Clark*, 982 F.2d 965, 968-69 (6th Cir. 1993).

Here, the prosecutor merely commented on Melcher's failure to support his own defense theory. The question, then, is whether either of the two exceptions applies. The first does not because Melcher testified. And the prosecutor never suggested that Melcher had failed to negate an element of the charges against him, which means the second does not apply either. We therefore reject Melcher's fifth and final challenge to his conviction.

\*　　\*　　\*

The district court's judgment is affirmed.