# IN THE SUPREME COURT OF IOWA

No. 22–0892

Submitted December 14, 2023—Filed February 23, 2024

**STATE OF IOWA,**

    Appellee,

vs.

**SYDNEY LEIANN SLAUGHTER,**

    Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Black Hawk County, Kellyann M. Lekar, Judge.

The State seeks further review of a court of appeals decision reversing the defendant's conviction for gambling, false claim of winnings. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED.**

Christensen, C.J., delivered the opinion of the court, in which Waterman, McDonald, and May, JJ., joined. Mansfield, J., filed an opinion concurring in part and dissenting in part, in which Oxley and McDermott, JJ., joined.

Martha Lucey, Appellate Defender, and Vidhya K. Reddy (argued), Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Martha E. Trout (argued), Assistant Attorney General, for appellee.

**CHRISTENSEN, Chief Justice.**

The defendant was convicted of gambling, false claim of winnings, pursuant to Iowa Code section 99F.15(4)(*h*), a class "D" felony, for falsely telling casino employees that she was the winner of a slot machine $4,000 jackpot when her boyfriend was the rightful winner. The court of appeals reversed the defendant's conviction. On further review, we affirm the defendant's conviction and conclude that there was sufficient evidence to show the defendant had the requisite intent to defraud and had not made a wager contingent on winning a gambling game.

### I. Background Facts and Proceedings.

Anthony McNeese and Sydney Slaughter arrived together at the Isle of Capri Casino early in the morning on November 29, 2020. McNeese entered the casino at approximately 3:20 a.m., and Slaughter entered at approximately 3:45 a.m. Surveillance video showed Slaughter and McNeese together on the casino floor several times throughout the morning. Sometimes they were leaning against one another or hugging, and occasionally, they were sitting in the same chair or Slaughter was sitting on McNeese's lap.

At approximately 4:26 a.m., Slaughter joined McNeese at a slot machine. McNeese was sitting in the chair in front of the slot machine, and Slaughter was standing to McNeese's left. Other than the slot machine McNeese was in front of, there were no other machines directly next to Slaughter. At 4:28 a.m., McNeese abruptly moved to a slot machine two seats down from the original machine. Slaughter then sat in McNeese's old seat. Almost simultaneously, the light on the top of the machine signaled a jackpot had been won. The jackpot was $4,000.

When a single winning of over $1,200 is won, casino employees are alerted, and the machine "freezes up" and becomes unusable until reset by an employee. Slot machine attendant Danielle Rademaker arrived at the machine and asked,

"[W]ho's my lucky winner? Who hit the button to initiate the spins or the jackpot?" Slaughter replied that she had pushed the button and won the money. Rademaker then began to fill out the slot request form that logs information about the machine the jackpot was won on, including, but not limited to, where on the floor the machine was located, the specific machine itself, and how many credits were played. Further, the winner of the jackpot is required to provide casino employees with their social security number to be included on the document, and they must also sign the slot request form.

A few minutes prior to responding to the jackpot, Rademaker had walked past McNeese playing on the slot machine. Because of her observation, Rademaker and the casino service supervisor shift manager, Jessee McCarvel, had the jackpot reviewed. The casino's surveillance team reviewed the footage and determined that McNeese had in fact been the one to win the jackpot, not Slaughter. McCarvel then asked Slaughter, "[W]ere you the one that . . . hit this jackpot? Like, were you the one that . . . hit the button?" McCarvel noted that Slaughter appeared flustered and out of sorts. McCarvel explained that it was against the law to claim somebody else's jackpot. Slaughter then stated that McNeese had hit the jackpot, and she was claiming it for him. Because McNeese was the true winner, he was required to provide his personal information to the casino employees so they could complete a new slot request form for the $4,000 jackpot.

The slot request form includes a section that requires the patron to decide what to do with their winnings. 5% of the winnings are automatically withheld for state income tax, but the patron determines what portion of the remaining 95% will be attributed to federal tax withholdings, if any, and what amount will be taken home. If a jackpot is won, casino employees are required to check a database that contains information on individuals who have unpaid financial

obligations. This is called an offset. The system autogenerates a letter that outlines the obligations contained in the database, and the letter is provided to the winner. If an individual has an offset, the casino is required to withhold some or all of the net winnings (the jackpot minus the mandatory state income tax withholding) to credit the outstanding financial obligation. However, if the patron chooses to withhold the remaining 95% of the jackpot for federal taxes, no money will go toward the offset.

Between July 20 and November 29, McNeese won seven jackpots worth a total of $19,460. On November 28, the day prior to the incident in question, McNeese won a jackpot of $1,250 and designated the remaining 95% of the winnings to federal taxes. The November 29 slot request form for the jackpot at issue showed McNeese designated the remaining 95% of the jackpot ($3,800) to go toward federal tax withholdings. Therefore, none of the jackpot was paid toward the $42,832 in outstanding financial obligations that McNeese owed to the Linn County Clerk of Court and for child support. Slaughter also won a jackpot on November 28 and voluntarily designated $1,050 of the winnings to be withheld to pay her outstanding financial obligation to the Linn County Clerk of Court. When Slaughter filled out the slot request form for the jackpot in question, like McNeese, she designated the remaining 95% of the winnings to go toward federal tax withholdings.

The State charged Slaughter with making a false claim of winning a jackpot under Iowa Code section 99F.15(4)(*h*) (2020). After a three-day trial, a jury convicted Slaughter of the charged offense. The district court sentenced Slaughter to a five-year term of incarceration, suspended the sentence, and placed her on probation for a period of two to five years. Slaughter timely appealed. We transferred the case to the court of appeals, which reversed the conviction. We granted the State's application for further review.

## II. Standards of Review.

We review sufficiency of the evidence claims for the correction of errors at law. *State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021). In reviewing the sufficiency of the evidence, "we are highly deferential to the jury's verdict." *Id.* If the jury's verdict is supported by substantial evidence, it binds this court. *Id.* Evidence is substantial if it is "sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *Id.* "We view the evidence in the light most favorable to the State, 'including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.' " *Tipton*, 897 N.W.2d at 692 (quoting *State v. Williams*, 695 N.W.2d 23, 27 (Iowa 2005)). However, we must also consider all evidence in the record, not only the evidence supporting guilt. *Id.*

Generally, we review a district court's evidentiary and trial objection rulings for abuse of discretion. *Kurth v. Iowa Dep't of Transp.*, 628 N.W.2d 1, 5 (Iowa 2001) (en banc). "An abuse of discretion occurs when the trial court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Tipton*, 897 N.W.2d at 690 (quoting *State v. Buenaventura*, 660 N.W.2d 38, 50 (Iowa 2003)). "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law." *Graber v. City of Ankeny*, 616 N.W.2d 633, 638 (Iowa 2000) (en banc). If an abuse of discretion is found, we will not reverse unless prejudice is shown. *Tipton*, 897 N.W.2d at 690.

## III. Analysis.

The State raises three issues on further review. First, the State contends that the evidence was sufficient to prove that Slaughter had the intent to defraud. Second, the State asserts that Iowa Division of Criminal Investigation Special Agent John Bergman's testimony at trial regarding what constitutes a "wager"

was permissible. Finally, the State argues that the evidence was sufficient to establish Slaughter did not make a "wager."

As a threshold matter, we must first address Slaughter's argument that regardless of whether there was sufficient evidence to establish Slaughter had an intent to defraud, the charged provision, Iowa Code section 99F.15(4)(*h*), only applies "to circumstances where a person claims they won when they did not, or where they claim they won an amount larger than they actually won," not to a circumstance where "winnings legitimately won by one person are passed to be claimed by another person." Slaughter argues that such circumstance is encompassed in Iowa Code section 99F.15(4)(*o*) (2023), a provision added by a 2022 statutory amendment two years after the incident at issue, which states one commits a prohibited activity where the person "[k]nowingly or intentionally passes a winning wager or share to another person or provides fraudulent identification in order to avoid the application of a setoff as provided in section 99F.19." *See* 2022 Iowa Acts ch. 1143, § 7 (codified at Iowa Code § 99F.15(4)(*o*) (2023)).

In effect, Slaughter is arguing that her conduct does not amount to the offense charged in the trial information. Under Iowa Rule of Criminal Procedure 2.11(6)(*a*) (2021), "If it appears from the indictment or information . . . that the particulars stated do not constitute the offense charged in the indictment or information . . . the court may and on motion of the defendant shall dismiss the indictment or information . . . ." Slaughter did not file a motion to dismiss the trial information; therefore, the district court did not have the opportunity to review the trial information under rule 2.11(6)(*a*). Generally, when reviewing matters, "we will not decide a case based on a ground not raised in the lower court." *State v. Petersen*, 678 N.W.2d 611, 614 (Iowa 2004). Thus, we find

Slaughter did not properly preserve her argument, and we will not consider this issue for the first time on appeal.

**A. Intent to Defraud.** The State contends that there was sufficient evidence to prove Slaughter had the "intent to defraud" as required under Iowa Code section 99F.15(4)(*h*) (2020). As marshaled to the jury, the State had to prove the following three elements to convict Slaughter of gambling, false claim of winnings:

> 1. On or about the 29th day of November, 2020, Sydney Slaughter or someone Sydney Slaughter aided and abetted, conspired with, or entered into a common scheme of design with, did claim, collect or take or attempt to claim, collect or take money from a gambling game.
>
> 2. Sydney Slaughter or someone Sydney Slaughter aided and abetted, conspired with, or entered into a common scheme of design with had the *specific intent to defraud.*
>
> 3. The money was claimed, collected or taken or was attempted to be claimed, collected, or taken without Sydney Slaughter having made a wager contingent on winning a gambling game.

Slaughter conceded that element one was satisfied. Relevant to this analysis is element two, which requires Slaughter to have had the specific intent to defraud. As correctly marshaled to the jury, "specific intent" means "not only being aware of doing an act and doing it voluntarily, but in addition, doing it with a specific purpose in mind." *See State v. Benson*, 919 N.W.2d 237, 247 (Iowa 2018). "Defraud" is not defined in Iowa Code chapter 99F, and we have not previously defined an "intent to defraud" in the context of the gambling statutes. If a word is not defined in the statute, "we look to precedent, similar statutes, dictionaries, and common usage to define the term." *Sanford v. Fillenwarth*, 863 N.W.2d 286, 289 (Iowa 2015).

In *State v. Hoyman*, in the context of the crime of fraudulent practices, we recognized a distinction between "deceit" and "defraud" and agreed that "to deceive means to mislead, whereas to defraud means to mislead with the further purpose of obtaining some gain from the victim of deceit." 863 N.W.2d 1, 9–10 (Iowa 2015). We found this distinction to be consistent with the United States Supreme Court's decision in *McNally v. United States*, 483 U.S. 350 (1987), *superseded by statute on other grounds*, 18 U.S.C. § 1346 (1994), where the Court explained that "[t]he words 'to defraud' commonly refer to 'wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane, or overreaching.' " *Hoyman*, 863 N.W.2d at 9 (quoting *McNally*, 483 U.S. at 358).

*Black's Law Dictionary* defines "defraud" to mean "[t]o cause injury or loss to (a person or organization) by deceit; to trick (a person or organization) in order to get money." *Defraud*, *Black's Law Dictionary* 535 (11th ed. 2019). Similarly, Merriam-Webster defines "defraud" as "[t]o deprive of something by deception or fraud." *Defraud*, Merriam-Webster, https://www.merriam-webster.com/dictionary/defraud [https://perma.cc/F57H-BEV2]. "Fraud" is an "[i]ntentional perversion of truth in order to induce another to part with something of value or to surrender a legal right; [a]n act of deceiving or misrepresenting." *Fraud*, Merriam-Webster, https://www.merriam-webster.com/dictionary/fraud [https://perma.cc/6SM9-Y8GF]. Finally, Merriam-Webster defines "deception" as "the act of causing someone to accept as true or valid what is false or invalid; the act of deceiving." *Deception*, Merriam-Webster, https://www.merriam-webster.com/dictionary/deception [https://perma.cc/HUF2-WCEJ].

These definitions are consistent with our holding in *Hoyman*. Thus, we hold that "defraud" in the context of Iowa Code section 99F.15(4)(*h*) means to

cause injury or loss of something with value, either to a person or organization, through deceit or trick, or to bring about some benefit to oneself. Our definition is consistent with the definition of "defraud" outlined by circuit courts in the context of different crimes. *See United States v. Yates*, 16 F.4th 256, 264 (9th Cir. 2021) (holding that in the context of bank fraud, "[a] scheme to defraud 'must be one to deceive the bank *and* deprive it of something of value,' that is, money or property" (quoting *Shaw v. United States*, 580 U.S. 63, 72 (2016))); *United States v. Klopf*, 423 F.3d 1228, 1240 (11th Cir. 2005) ("Intent to defraud has often been defined as 'the specific intent to deceive or cheat, for the purpose of either causing some financial loss to another, or bringing about some financial gain to one's self.' " (quoting *United States v. Peden*, 556 F.2d 278, 280 (5th Cir.1977))); *United States v. Godwin*, 566 F.2d 975, 976 (5th Cir. 1978) (per curiam) ("Intent to deceive and intent to defraud are not synonymous. Deceive is to cause to believe the false or to mislead. Defraud is to deprive of some right, interest or property by deceit."). Therefore, to prove that Slaughter had an intent to defraud, or aided and abetted McNeese who had an intent to defraud, it must be shown that either Slaughter or McNeese desired to cause injury or loss of something with value, either to a person or organization, through deceit or trick, or bring a benefit to themselves.

Generally, intent cannot be proved by direct evidence. *State v. Crawford*, 974 N.W.2d 510, 518 (Iowa 2022). Instead, proof of intent is usually shown through "circumstantial evidence and inferences reasonably drawn from the circumstances." *Id.* An individual's actions and the surrounding circumstances, including one's conduct before and after the alleged crime, are relevant in determining whether there was substantial evidence to prove specific intent. *See id.* at 519. Additionally, we look to whether the defendant actively encouraged, participated, or assented to the crime. *See id.*

Here, McNeese and Slaughter arrived at the casino together. Whether they were affiliated with each other prior to the evening in question, it is clear from the video footage that they were affiliated with one another that day, as the video footage showed them hugging and sitting with one another several times throughout the early morning. When McNeese began using the slot machine, Slaughter was not by his side. It was not until later that Slaughter joined McNeese at the slot machine. Once the $4,000 jackpot was won, McNeese moved to a seat two chairs down from the original machine, and Slaughter quickly took McNeese's spot. When asked by casino employees who had won the jackpot, Slaughter immediately stated she had and provided the employees with her social security number and signed the slot request form in order to claim the prize.

Because she had won a jackpot the prior day and paid the winnings toward her outstanding financial obligations, Slaughter was aware that any jackpot winnings may be applied to an offset. While no direct evidence was entered to show that Slaughter knew McNeese owed an offset or that Slaughter was specifically intending to defraud McNeese's creditors, that is not necessary. All that is necessary is that Slaughter intended to cause an injury or loss of something with value, either to a person or organization, through deceit or trick, or aided McNeese in doing so.

Slaughter argues that had she had the intent to defraud someone or cause a benefit to herself, she would not have allocated all the winnings to federal taxes. However, it is important to note that if all the winnings are allocated to federal taxes, that does not mean the jackpot winner will never receive any of the winnings. When an individual income tax return is filed at the end of the fiscal year showing how much money one earned and how much money was paid in taxes, if one paid more taxes than was owed, one will receive a check from the

Internal Revenue Service totaling the amount overpaid. The same concept is true here. If Slaughter put all the winnings toward federal taxes and paid more taxes than she owed, she would receive a return with the money she overpaid, thereby benefiting herself. Similarly, if she had outstanding federal tax obligations and the winnings were applied to such outstanding obligations, Slaughter would still receive a benefit from allocating the winnings to her federal taxes.

The fact that Slaughter intended to deprive someone, whether it was McNeese, McNeese's creditors, the casino, or another individual or entity, of the $4,000 jackpot or was aware of McNeese's intention to deprive someone of the jackpot is a reasonable inference that can be fairly drawn from the circumstantial evidence presented. Otherwise, what was the purpose of Slaughter taking McNeese's place and attempting to claim the jackpot? Her demeanor when claiming the jackpot and the fact that she later retracted her statement upon finding out it was a crime to falsely claim the jackpot provide further support that she had an intent to defraud or aided and abetted McNeese, who had an intent to defraud. A jury could also have reasonably inferred that by attempting to claim the jackpot, regardless of the fact that she allocated 95% of the winnings to federal taxes, Slaughter intended to bring about some financial gain to herself. Therefore, we find the evidence was sufficient to prove Slaughter had an intent to defraud.

While it is possible the jury could have come to an alternate conclusion, it is not within the province of our court "to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury." *State v. Brimmer*, 983 N.W.2d 247, 256 (Iowa 2022) (quoting *State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006)); *Williams*, 695 N.W.2d at 28; *see also State v. Dohlman*, 725 N.W.2d 428, 430 (Iowa 2006) ("Evidence is not insubstantial merely because

we may draw different conclusions from [the evidence]; the ultimate question is whether it supports the finding actually made, not whether the evidence would support a different finding." (alteration in original) (quoting *Fischer v. City of Sioux City*, 695 N.W.2d 31, 34 (Iowa 2005), *abrogated on other grounds by Breese v. City of Burlington*, 945 N.W.2d 12 (Iowa 2020))). The jury found Slaughter had the intent to defraud or aided and abetted McNeese, who had the intent to defraud, and such verdict is supported by substantial evidence.

**B. Wager.** On further review, the State urges that Special Agent Bergman's testimony regarding the definition of "wager" was admissible. The State further contends that the court of appeals incorrectly defined "wager" and that its proffered definition does not apply in the context of slot machines. Additionally, the State argues that there was sufficient evidence to prove Slaughter did not make a wager contingent on winning a gambling game as required under Iowa Code section 99F.15(4)(*h*).

1. *Special Agent Bergman's testimony.* The State contends that the court of appeals erred in finding that Special Agent Bergman's testimony about what constitutes a "wager" was inadmissible. The court of appeals took no issue with Special Agent Bergman discussing his prior work experience with the gaming bureau and the relevant investigation; however, it held that "his definition of wager fell outside the scope of admissible testimony by providing an opinion on a legal standard essential to the charged offense." We disagree.

Under Iowa Rule of Evidence 5.702 (2021), expert opinion testimony is permissible "if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." We generally favor a "liberal view on the admissibility of expert testimony." *Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 600 (Iowa 2017) (quoting *Ranes v. Adams Lab'ys, Inc.*, 778 N.W.2d 677, 685 (Iowa

2010)). It is within a trial court's discretion as to whether "a witness may testify as an expert with reference to a particular topic." *Heinz v. Heinz*, 653 N.W.2d 334, 341 (Iowa 2002). An expert is not permitted to testify about "whether a particular legal standard has been satisfied or to 'the defendant's guilt or innocence.'" *State v. Tyler*, 867 N.W.2d 136, 153–54 (Iowa 2015) (quoting *State v. Smith*, 522 N.W.2d 591, 593–94 (Iowa 1994)). However, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Iowa R. Evid. 5.704.

The issue here is whether Special Agent Bergman was permitted to testify as to the definition of "wager." At trial, the prosecution asked Special Agent Bergman, "When is a wager actually placed?" In response, Special Agent Bergman testified:

> A wager is placed -- in the context of a slot machine, the wager is placed when the machine is caused to go into its, for lack of a better term, I'll say spin. So it could be when a button is pushed to cause that machine to play, or maybe in the case of a machine with a handle that's pulled, it would be when the handle is deployed. It's not when the credits are inserted into the machine. It's when the button is actually pushed.

Slaughter objected to his testimony, stating that it called for Special Agent Bergman to draw a legal conclusion, which is for the jury to decide, not Special Agent Bergman. On cross-examination, Slaughter inquired about the basis of Special Agent Bergman's testimony, and the following exchange took place:

> Q. Okay. Now, you told us that a wager is placed when the credits are deployed; correct?
>
> A. Fair. Yes.
>
> Q. And that is your opinion of when a wager is placed?
>
> A. No, ma'am. There is -- there are case law that specifically defines when a wager is -- when a wager has occurred.

Q. Well, you would agree with me, Agent, that it is not your job to tell the Jury today what the law they should follow is; is that right?

A. That's not my job.

Q. So when you tell them that's when a wager is placed, you are not telling them that is the law they should be following. Is that fair to say?

A. I'm telling them that in my 22 years of experience in my job, that's the definition of when a wager is placed.

In general, experts are not automatically barred from testifying as to the definitions of certain words. *See United States v. Anderson*, 446 F.3d 870, 875 (8th Cir. 2006) ("The district court did not abuse its discretion in permitting Kyle to describe generalized gambling operations and terminology."); *Atl. Mut. Ins. v. Comm'r*, 111 F.3d 1056, 1060 (3d Cir. 1997) ("The expert testimony here makes clear that the term "reserve strengthening" as used in section 1023(e)(3)(B) is subject to more than one interpretation."), *aff'd*, 523 U.S. 382 (1998); *Ga. Operators Self-Insurers Fund v. PMA Mgmt. Corp.*, 143 F. Supp. 3d 1317, 1339 (N.D. Ga.) ("As an experienced and licensed adjusting expert, McCoy helped *define terms*, explain relevant concepts, and identify standards of performance." (emphasis added)), *aff'd*, 631 F. App'x 730 (11th Cir. 2015) (per curiam); *United States v. King*, No. 5:10–HC–2009–FL, 2012 WL 4447577, at *31 (E.D.N.C. Mar. 1, 2012) ("Although the statute does not provide a definition for "serious," the testifying experts in this case all interpret it to mean . . . ."), *report and recommendation adopted*, No. 5:10–HC–2009–FL, 2012 WL 4447451 (E.D.N.C. Sept. 25, 2012), *aff'd*, 539 F. App'x 235 (4th Cir. 2013) (per curiam); *Ways v. City of Lincoln*, 206 F. Supp. 2d 978, 991 (D. Neb. 2002) ("[E]xpert testimony that purports to *explain the legal meaning of a term* is forbidden . . . , but testimony *defining a term of art* as it is used within a given field may be allowed."); *Cacioppo v. Eagle Cnty. Sch. Dist. Re-50J*, 92 P.3d 453, 466 (Colo. 2004)

(en banc) ("The trial court heard expert testimony concerning the nature and definition of a so-called 'phased-in' tax . . . ."); *Wisner v. Vandelay Invs., L.L.C.*, 916 N.W.2d 698, 726 (Neb. 2018) ("The definition of a mental disorder provided by the experts appears to be broader than the standard required by the statute."); *Hutchins v. Town of Colton*, No. 116349, 2004 WL 3425347, at *3 (N.Y. Sup. Ct. 2004) ("It is important to note that while no statutory definition of ATV 'areas and trails' exists, Respondents' expert provides an expansive definition therefor . . . ."); *Traxler v. Entergy Gulf States, Inc.*, 376 S.W.3d 742, 746 (Tex. 2012) ("Traxler offered expert testimony regarding the meaning of transmission and distribution lines."); *Xerox Corp. v. Wis. Dep't of Revenue*, 772 N.W.2d 677, 688 (Wis. Ct. App. 2009) ("[T]he Commission concluded that the words as used in the statute . . . were not technical words, and therefore rejected Xerox's argument that the undisputed industry *definitions provided by its experts* should apply." (emphasis added)).

The issue with experts providing definitions of words arises when the word being defined, or the opinion being provided, is couched in legal terms. In such circumstance, the opinion is excludable if the "terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular." *In re Det. of Palmer*, 691 N.W.2d 413, 420 (Iowa 2005) (quoting *Torres v. County. of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985)), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699 (Iowa 2016). However, opinion testimony that uses legal terms may be admissible if the legal definition and the meaning of the term in common usage are the same or similar. *See id.* For example, in *In re Detention of Palmer*, we held that an expert was permitted to testify as to whether a pedophile was "likely" to reoffend because the popular meaning of "likely" was nearly the same as the legal meaning. *Id.* at 421. However, the expert was not permitted to testify regarding the statutory

terms "predatory" and "sexually violent offenses," as those were terms with separate and distinct legal meanings. *Id.*

Here, Special Agent Bergman provided his opinion on when a "wager" is placed based on the specialized knowledge he has gained through his twenty-two years of experience working in the gaming bureau. His opinion was that in the context of a slot machine, a "wager" occurs when the button is pushed that sends the machine into play, not when the coin or token is inserted into the machine. The average layman would understand the term "wager" and would likely "ascribe to [it] essentially the same meaning intended by the expert witness," *United States v. Hearst*, 563 F.2d 1331 (9th Cir. 1977) (per curiam), as simply putting the coin or token into the machine does not generate the possibility of winning, only pushing the button begins the game of chance. Additionally, for the State to succeed in its case, one of the elements it had to prove was that Slaughter did not place a "wager." Thus, Special Agent Bergman's testimony regarding "wager" was testimony that would aid the jury in determining an ultimate fact at issue. It was not testimony that opined on the jury's ultimate decision: Whether Slaughter had made a wager or not. As a result, Special Agent Bergman's testimony regarding the definition of "wager" was admissible. *See Palmer*, 691 N.W.2d at 421.

Slaughter additionally takes issue with Special Agent Bergman's testimony that his definition was in accordance with caselaw. While such testimony was inappropriate and should have been stricken from the record, we only find reversible error if "the admission of improper evidence affects a party's substantial rights." *State v. Neiderbach*, 837 N.W.2d 180, 204 (Iowa 2013) (quoting *In re Det. of Stenzel*, 827 N.W.2d 690, 708 (Iowa 2013)). We find the trial court's error in admitting Special Agent Bergman's reference to caselaw was harmless for three reasons.

First, Slaughter offered no rebuttal evidence of her own as to the definition of "wager" and did not suggest a definition to be included in the jury instructions, and when asked if she had any objection to the jury instructions that did not include a definition of "wager," Slaughter stated she had no objection. *See Mensink v. Am. Grain,* 564 N.W.2d 376, 382 (Iowa 1997) (noting that an expert's testimony was not inappropriate when it did not go to the jury's ultimate decision, the jury was free to disregard the testimony altogether, and the defendants could have attacked the testimony on cross-examination or through rebuttal evidence).

Second, by instructing the jury that they were permitted to disregard expert testimony, the trial court helped protect against the chance of the jury misconstruing Special Agent Bergman's testimony. *See id.*; *see also United States v. Milton,* 555 F.2d 1198, 1203–04 (5th Cir. 1977) ("[T]he trial court's admonitions to the jury to accord no unusual deference to expert testimony and to take the court's instructions as the sole source of applicable law . . . helped protect against the jury's misconstruing [the expert's] statement."). Further, Special Agent Bergman later testified that it was not his job to tell the jury what the law was and that his definition was derived from his work experience.

Finally, as described in more detail below, there was ample evidence to show that Slaughter did not make a "wager," regardless of what definition was proscribed to the term. *See State v. Brotherton,* 384 N.W.2d 375, 380 (Iowa 1986) (en banc) ("Opinion testimony erroneously admitted into evidence is without prejudice when it is unlikely any juror's understanding was altered or in any way affected by the opinion."). Therefore, we find that Special Agent Bergman's testimony regarding the definition of "wager" was permissible, and while the trial court erred in admitting the testimony that his definition was in accordance with caselaw, such error was harmless.

2. *Whether Slaughter made a wager contingent on winning a gambling game.* Finally, the State contends that there was sufficient evidence to prove Slaughter did not make "a wager contingent on winning a gambling game" as required under Iowa Code section 99F.15(4)(*h*). "Wager" is not defined in Iowa Code section 99F.15 or Iowa Code chapter 99F. However, regardless of how "wager" is defined, it is evident that Slaughter did not make a wager.

McNeese was playing at the slot machine alone before Slaughter joined him. The claim slips that were entered into evidence show that only one coin (or credit) was played on the machine that won the jackpot. If only one coin was played from the time McNeese first began using the machine to when Slaughter claimed the jackpot, it necessitates a finding that McNeese was the one who inserted the coin, not Slaughter. Throughout all the times McNeese and Slaughter were seen together during the morning in question, there was no indication that Slaughter gave McNeese money or that the coin McNeese put in the slot machine was Slaughter's. The video surveillance footage depicts McNeese playing the slot machine, not Slaughter. Further, Slaughter even admitted to McNeese being the true winner of the jackpot.

Simply because the jury could have drawn a different conclusion from the evidence does not mean the evidence was insufficient. *Dohlman*, 725 N.W.2d at 430. The question is whether the evidence "supports the finding actually made, not whether the evidence would support a different finding." *Id.* (quoting *Fischer*, 695 N.W.2d at 34, *abrogated on other grounds by Breese v. City of Burlington*, 945 N.W.2d 12 (Iowa 2020)). Here, the jury found Slaughter did not make a wager, and such finding is supported by substantial evidence.

**IV. Conclusion.**

For these reasons, we affirm Slaughter's conviction for gambling, false claim of winnings.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED.**

Waterman, McDonald, and May, JJ., join this opinion. Mansfield, J., files an opinion concurring in part and dissenting in part, in which Oxley and McDermott, JJ., join.

**MANSFIELD, Justice (concurring in part and dissenting in part).**

I concur in part and dissent in part. I agree there was sufficient evidence to sustain a conviction. But I vigorously dissent from the majority's conclusion that a Division of Criminal Investigation (DCI) agent could testify as an "expert" on the meaning of the criminal statute at issue. The court of appeals got this issue right: "Even under our liberal view of expert testimony, Bergman's opinion on when a wager is placed did not assist the jury in deciding if Slaughter violated the statute." Our legal system does not allow law enforcement officers to tell the jury how to interpret the controlling law in criminal cases.

Sydney Slaughter's primary defense at trial was that the State failed to prove it wasn't her money in the machine. As her attorney explained in closing argument,

> Isn't it entirely possible and reasonable, Members of the Jury, that she might have said, I have this 25 dollars left, but you're luckier than me. You put that into the machine and play it, and if it wins, I'll take it. Imagine a group of friends who go to a casino. They're going to go, and a different friend says, I would love to, but I'm broke. I can't afford it. Another friend says, I'll -- I'll spot ya. I'll give you 50 dollars. You can play. Well, if that friend wins thousands of dollars, who gets to keep that money? Is it not reasonable that the first friend might say, no, that's mine. I gave you that money.
>
> It's not our burden to prove to you, Members of the Jury, that that is what happened. It was the State's burden to prove to you that it wasn't, to prove that she had the specific intent to defraud, but you've heard no testimony about that. You've seen no evidence showing you whose money was placed into that machine, and because the State has simply provided you with a story, they have failed to meet their burden when it comes to showing that Ms. Slaughter had the specific intent to defraud.
>
> . . . .
>
> So Members of the Jury, is it reasonable to think that Ms. Slaughter could have believed she made a wager if it was

> her money placed into that machine? If her money was placed into that machine and she thought, if this wins, that's my money. I made that wager. I paid for that game. Well, then she has made a wager contingent on winning, and the State has not met their burden.
>
> As we discussed, you didn't hear any evidence to tell you whose money was in there, so maybe it was Ms. Slaughter's, maybe it wasn't.

My hunch is that this defense wouldn't have carried the day anyway, but Slaughter was entitled to assert it. Unfortunately, this defense was directly undermined by Agent Bergman's improper testimony, admitted over objection, that the wager is placed "when the handle is deployed," and "not when the credits are inserted into the machine." As Agent Bergman later admitted, his basis for reaching this conclusion was purported "caselaw." Such caselaw turns out to have been nonexistent. The admission of this improper testimony was prejudicial and necessitates a new trial.

> In theory, the judge is the sole authority on the law and its interpretation. This simple proposition is so basic to the common law system that it scarcely needs repeating. The corollary of this truism is that an expert witness may not give an opinion to the court or the jury on an issue of law.

Maury R. Olicker, *The Admissibility of Expert Witness Testimony: Time to Take the Final Leap?*, 42 U. Mia. L. Rev. 831, 862 (1988). Of course, an opinion is not objectionable *just because* it embraces an ultimate issue. *See* Iowa R. Evid. 5.704. In other words, opinions can be offered on *factual* matters that happen to be ultimate issues. *See State v. Murphy*, 451 N.W.2d 154, 155–56 (Iowa 1990) (explaining that a police officer may opine on a defendant's sobriety because Iowa Rule of Evidence 704 allows opinions on an "ultimate fact issue").

But as the advisory committee note to Federal Rule of Evidence 704 makes clear, other rules of evidence "exclude opinions phrased in terms of inadequately explored legal criteria." Thus: "Rule 702 prohibits expert witnesses from

testifying to legal conclusions. An expert offers a legal conclusion when he defines the governing legal standard or applies the standard to the facts of the case." *United States v. Melcher*, 672 F. App'x 547, 552 (6th Cir. 2016) (citation omitted); *see also United States v. Mosby*, 626 F. Supp. 3d 847, 861 (D. Md. 2022) ("The Fourth Circuit has long reasoned that expert testimony as to the proper interpretation of applicable domestic law is inadmissible."); David H. Kaye et al., *The New Wigmore: A Treatise on Evidence: Expert Evidence* § 2.3.1, at 71 (3d ed. 2021) ("Opinions of experts as to the meaning of words in statutes or other sources of domestic law typically are inadmissible."); Benjamin J. Vernia, Annotation, *Admissibility of Expert Testimony Regarding Questions of Domestic Law,* 66 A.L.R.5th 135 (1999) ("Although the modern view of expert testimony suggests that it should be available to elucidate a wide variety of questions, courts traditionally have restricted the use of expert testimony to factual, as opposed to legal, questions.").

Until today, we have consistently followed that approach here in Iowa. *See In re Det. of Palmer*, 691 N.W.2d 413, 419 (Iowa 2005) ("[A] witness cannot opine on a legal conclusion or whether the facts of the case meet a given legal standard."), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699 (Iowa 2016); *Terrell v. Reinecker*, 482 N.W.2d 428, 430 (Iowa 1992) (en banc) (holding it was reversible error to allow an investigating police officer to testify to the legal conclusion that plaintiff "failed to yield the right-of-way").

Legal interpretation under the guise of expert testimony is bad enough. Worse yet when the purported expert is *a DCI agent*—not a specialist on gaming law or even an attorney. I accept that Agent Bergman has spent a lot of time in casinos. But so have thousands of Iowans whom we wouldn't allow to offer legal opinions on gaming law. And at least those other individuals, if they had testified, wouldn't have the same aura or mystique for the jury.

The majority struggles to defend a ruling that, in my view, is not defensible. First, the majority string-cites irrelevant cases. Some of the cases are unpublished, only one of the cases is criminal, and none involves the testimony of a law enforcement officer as a purported legal expert.

Next, the majority contends that there was no harm, no foul because the average layperson would probably agree with Agent Bergman's testimony. I question that assertion: it seems plausible that the wager can be placed by the person who pays for it. A leading dictionary defines "wager" as: "to make a bet," "to risk or venture on a final outcome," and "to lay as a gamble." *Wager, Merriam-Webster's Collegiate Dictionary* 1405 (11th ed. 2003). Another defines the term as: "Money or other consideration risked on an uncertain event; a bet or gamble," and "A promise to pay money or other consideration on the occurrence of an uncertain event." *Wager, Black's Law Dictionary* 1893 (11th ed. 2019). These definitions could certainly embrace paying someone else to operate the gaming machine on your behalf.

The majority also maintains that Agent Bergman's testimony didn't go to the ultimate issue of "[w]hether Slaughter had made a wager or not." This is splitting hairs. Agent Bergman testified that the wager was placed when the button was pushed rather than when the credit was inserted, and Slaughter's main defense was that there was no proof it wasn't her credit. So Agent Bergman's testimony went to the ultimate issue, even if it didn't mention Slaughter by name. Regardless, the majority is confused about the governing standard. Just as testifying on an ultimate issue isn't necessarily a no-no, testifying on a subsidiary issue isn't necessarily a yes-yes. The relevant question is whether the expert was offering an opinion on an issue of law.

The majority further criticizes Slaughter for not introducing rebuttal evidence of her own as to the definition of "wager." The criticism is unfair to the

criminal defendant. Slaughter had no prior notice of Agent Bergman's expert opinion from the minutes, and even if she had, what would be the point of presenting someone else's inadmissible opinion on the law to counter the inadmissible opinion of a law enforcement agent? Our error preservation rules do not require criminal defendants to try to minimize the effects of inadmissible prosecution evidence by trying to scrape up inadmissible evidence of their own.

Lastly, the majority cites to the stock jury instruction that jurors should treat the testimony of experts like that of other witnesses. Of course, if that instruction were a panacea, then error could never be predicated on the improper admission of expert testimony. That instruction is routinely given, and yet we reverse cases when expert testimony has been improperly admitted. *See, e.g.*, *State v. Tyler*, 867 N.W.2d 136, 167 (Iowa 2015).

The majority disregards the *relevant* legal authority from Iowa and other jurisdictions. For example, in *State v. Breitbach*, the defendant was charged with the crime of escape. 488 N.W.2d 444, 445 (Iowa 1992). We explained that it was improper for two officers to have testified that the defendant was "in custody" prior to his absconding. *Id.* at 447–48. As we put it, "Since 'custody' is a standard fixed by law and a matter upon which the jury will ultimately have to draw its own conclusion, conclusory expert testimony on this matter is not admissible." *Id.* at 448. *Breitbach* is directly on point and directly contrary to the majority's reasoning. *See also State v. Droste*, 232 N.W.2d 483, 488 (Iowa 1975) ("When a standard . . . has been fixed by law, no witness . . . is permitted to express an opinion as to whether or not the person or the conduct, in question, measures up to that standard.").

Other courts have prohibited testifying police officers from defining legal terms. A California case is illustrative. In *People v. Torres*, the defendant was found guilty of murder charges. 39 Cal. Rptr. 2d 103, 106 (Ct. App. 1995). The

trial revolved around various gang-related issues. *Id.* An officer from the Los Angeles Police Department's gang unit was permitted to define "extortion" and "robbery" while testifying. *Id.* at 107. The defendant appealed, arguing that "a witness's opinion about the meaning of a statute is an improper subject of expert opinion and, therefore, it was improper for [the officer] to define the offenses . . . for the jury." *Id.*

The California Court of Appeal agreed that the testimony was improper. *Id.* It relied on caselaw that "held the definition of a statutory term is a matter of law on which the court should instruct the jury; it is not a subject for opinion testimony." *Id.* Further, it stated that "[i]t is the court and not the witness which must declare what the law is, it not being within the province of a witness, for example, to testify as to what constitutes [various crimes]." *Id.* at 108 (quoting *People v. Clay*, 38 Cal. Rptr. 431, 437 (Dist. Ct. App. 1964)). It noted that such evidence is inadmissible because it would "leav[e] the definition of statutory terms to be proved or disproved in every case" and harm the administration of justice. *Id.* Additionally, "it is the duty of the trial judge to instruct the jurors on the general principles of law pertinent to the case." *Id.*; *see also State v. Yip*, 987 P.2d 996, 1007 (Haw. Ct. App. 1999) (explaining that law enforcement officer's testimony that the defendant was not engaged in social gambling "may have improperly conveyed his 'unexpressed, and perhaps erroneous, legal standards to the jury,' and thus may have amounted to a 'usurpation of the court's responsibility to determine the applicable law and to instruct the jury as to that law' " but that any error was harmless because the defendant was not entitled to the defense as a matter of law (quoting *Create 21 Chuo, Inc. v. Sw. Slopes, Inc.*, 918 P.2d 1168, 1178 n.4 (Haw. Ct. App. 1996))); *State v. Merchant*, 827 N.W.2d 473, 481 (Neb. 2013) (holding that a government official's "testimony interpreting the statutes was not relevant and was unfairly prejudicial"); *Cotton v. State*, 810

N.W.2d 132, 138 (Neb. 2011) (per curiam) (holding that "[t]he district court did not err when it excluded [trooper's opinions] regarding the meaning of 'apprehend' as used in [a Nebraska statute]").

When testimony is improperly admitted, we must determine if the evidentiary error was harmless. *See* Iowa R. Evid. 5.103 ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party . . . ."). I believe it was not. There was no jury instruction defining "wager." Thus, the only "evidence" filling in this gap was Agent Bergman's improper testimony. As I've already discussed, a jury could have accepted the notion that S is making the wager if they provide the credit to the machine even though M pushes the button, especially when the two of them are a couple. Indeed, the Iowa Lottery has a page on their website devoted to "group play"—where the prize belongs to a group rather than the specific individual who bought the winning ticket. *See Player Security: Some Reminders About Group Lottery Play*, Iowa Lottery, https://ialottery.com/Pages/PlayerSecurity/ GroupPlayReminders.aspx [https://perma.cc/4JN9-BJ4Q].

Slaughter and Anthony McNeese were indisputably together that night at the casino. Yet there was no evidence as to which of them was responsible for funding the machine on which the jackpot was won. Slaughter initially claimed the jackpot for herself. When confronted by the shift supervisor who asked, "[W]ere you the one that had hit the button?" and who also told Slaughter it was "against the law to claim somebody else's jackpot," Slaughter backed down. That is, Slaughter said, "[N]o, it was actually Anthony that had hit it; that she was claiming it for him." But none of this amounts to an admission that the money wasn't hers.

For the foregoing reasons, I would find the evidence sufficient to sustain Slaughter's conviction, but I would reverse and remand for a new trial because of the error in the admission of Agent Bergman's legal opinion.

Oxley and McDermott, JJ., join this concurrence in part and dissent in part.